# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF MICHIGAN

PNC BANK, NATIONAL ASSOCIATION,
a national banking association,

                     Plaintiff,                          Case No.

v.

                                                         Hon.

MID MICHIGAN FEED
 INGREDIENTS, L.L.C.,
a Michigan limited liability company,
GRATIOT AG INVESTMENTS, L.L.C.,
a Michigan limited liability company,
JBT GRAIN COMPANY, L.L.C.,
a Michigan limited liability company,
WAINO PIHL, an individual, and
CHS INC., a Minnesota corporation,

                     Defendants.
_____

**MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.**
Joseph M. Ammar (P41972)
Megan R.I. Baxter (P81945)
Attorneys for Plaintiff
150 W. Jefferson Ave., Suite 2500
Detroit, MI 48226
(269) 383-5810 / (313) 496-8459
ammar@millercanfield.com
baxter@millercanfield.com
_____

## **COMPLAINT**

Plaintiff, PNC Bank, a National Banking Association, by its attorneys, Miller, Canfield, Paddock and Stone, P.L.C., for its Complaint against Defendants, states as follows:

## THE PARTIES

1.      Plaintiff, PNC Bank, a National Banking Association ("Plaintiff" or "Bank") is a national bank chartered under the laws of the United States, with its home office, as set forth in its articles of association, located in the State of Delaware.

2.      Defendant, Mid Michigan Feed Ingredients, L.L.C. ("Mid Michigan Feed"), is a Michigan limited liability company whose registered office is 4584 ½ W. Garfield Road, Middleton, Michigan 48856. Upon information and belief, the members of Mid Michigan Feed Ingredients, L.L.C. are Waino Pihl, individually; Kris D. Duflo, Trustee of the Kris D. Duflo Revocable Living Trust Agreement Under an Agreement Dated October 13, 2003, as amended ("Kris Duflo Trust"); Kim C. Duflo, Trustee of the Kim C. Duflo Revocable Living Trust Agreement Under an Agreement Dated December 14, 2007 ("Kim Duflo Trust"); and Kelvin L. Duflo, Trustee of the Kelvin L. Duflo Revocable Living Trust Agreement Dated September 17, 2008 ("Kelvin Duflo Trust"). Upon information and belief, the Kris Duflo Trust is a Michigan trust maintaining its address at 1445 Garfield Road, Perrinton, Michigan 48871, and Kris D. Duflo is the Trustee of the Kris Duflo Trust.  Upon information and belief, the Kim Duflo Trust is a Michigan trust maintaining its

address at 709 N. Hillman Road, Stanton, Michigan 48888, and Kim C. Duflo is the Trustee of the Kim Duflo Trust.  Upon information and belief, the Kelvin Duflo Trust is a Michigan trust maintaining its address at 10171 Garfield Road, Carson City, Michigan 48811, and Kelvin L. Duflo is the Trustee of the Kelvin Duflo Trust.

3.      Defendant, Gratiot Ag Investments, L.L.C. ("Gratiot"), is a Michigan limited liability company whose registered office is 4584 ½ W. Garfield Road, Middleton, Michigan 48856. Upon information and belief, the members of Gratiot Ag Investments, L.L.C. are Waino Pihl, individually; Kris D. Duflo, Trustee of the Kris D. Duflo Revocable Living Trust Agreement Under an Agreement Dated October 13, 2003, as amended ("Kris Duflo Trust"); Kim C. Duflo, Trustee of the Kim C. Duflo Revocable Living Trust Agreement Under an Agreement Dated December 14, 2007 ("Kim Duflo Trust"); and Kelvin L. Duflo, Trustee of the Kelvin L. Duflo Revocable Living Trust Agreement Dated September 17, 2008 ("Kelvin Duflo Trust"). Upon information and belief, the Kris Duflo Trust is a Michigan trust maintaining its address at 1445 Garfield Road, Perrinton, Michigan 48871, and Kris D. Duflo is the Trustee of the Kris Duflo Trust.  Upon information and belief, the Kim Duflo Trust is a Michigan trust maintaining its address at 709 N. Hillman Road, Stanton, Michigan 48888, and Kim C. Duflo is the Trustee of the Kim Duflo Trust. Upon information and belief, the Kelvin Duflo Trust is a Michigan trust maintaining

its address at 10171 Garfield Road, Carson City, Michigan 48811, and Kelvin L. Duflo is the Trustee of the Kelvin Duflo Trust.

4.      Defendant, JBT Grain Company, L.L.C. ("JBT"), is a Michigan limited liability company whose registered office is 4584 ½ W. Garfield Road, Middleton, Michigan 48856. Upon information and belief, the members of JBT Grain Company, L.L.C. are Waino Pihl, individually; Kris D. Duflo, Trustee of the Kris D. Duflo Revocable Living Trust Agreement Under an Agreement Dated October 13, 2003, as amended ("Kris Duflo Trust"); Kim C. Duflo, Trustee of the Kim C. Duflo Revocable Living Trust Agreement Under an Agreement Dated December 14, 2007 ("Kim Duflo Trust"); and Kelvin L. Duflo, Trustee of the Kelvin L. Duflo Revocable Living Trust Agreement Dated September 17, 2008 ("Kelvin Duflo Trust"). Upon information and belief, the Kris Duflo Trust is a Michigan trust maintaining its address at 1445 Garfield Road, Perrinton, Michigan 48871, and Kris D. Duflo is the Trustee of the Kris Duflo Trust.  Upon information and belief, the Kim Duflo Trust is a Michigan trust maintaining its address at 709 N. Hillman Road, Stanton, Michigan 48888, and Kim C. Duflo is the Trustee of the Kim Duflo Trust.  Upon information and belief, the Kelvin Duflo Trust is a Michigan trust maintaining its address at 10171 Garfield Road, Carson City, Michigan 48811, and Kelvin L. Duflo is the Trustee of the Kelvin Duflo Trust.

5.     Defendant, Waino Pihl, is an individual who, upon information and belief, resides at 5788 Wells Road, Ithaca, Michigan 48847, is domiciled in the State of Michigan, and intends to make a home in the State of Michigan indefinitely.  Mid Michigan Feed Ingredients, L.L.C., Gratiot Ag Investments, L.L.C., JBT Grain Company, L.L.C. and Waino Pihl are collectively referred to as the "Obligor Defendants."

6.     Defendant, CHS Inc. ("CHS"), upon information and belief, is a Minnesota corporation whose resident agent is CSC-Lawyers Incorporating Service Company and whose registered office address is 2900 West Road, Suite 500, East Lansing, Michigan 48823. Upon information and belief, the principal place of business of Defendant CHS is in the State of Minnesota. CHS is named as a defendant in this action because it claims an interest in certain personal property of Defendant Mid Michigan Feed. The lien of CHS is subordinate to the lien in the personal property described in the Security Agreement between Defendant Mid Michigan Feed and Bank.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as complete diversity exists between the parties, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

8.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a), because the facts and circumstances giving rise to this cause of action occurred in Gratiot County, Michigan.

## THE LOAN DOCUMENTS

9.     On July 31, 2018, Defendant Mid Michigan Feed made and delivered to Bank an Amended and Restated Term Note, effective as of June 1, 2018, in order to evidence a term loan that Bank extended to Defendant Mid Michigan Feed in the original principal amount of $1,199,530.30 (the "Note").  **Exhibit A**.

10.     In conjunction with the Bank's extension of credit to Mid Michigan Feed, on  December 3, 2012, Mid Michigan Feed executed a Loan Agreement (the "Loan Agreement") which set forth additional terms and conditions governing the loan relationship. **Exhibit B**.

11.     Repayment of the Note was secured by a Security Agreement dated December 3, 2012 ("Security Agreement") executed by Mid Michigan Feed in favor of the Bank, granting Bank a security interest in all of its assets (the "Collateral"). **Exhibit C**.

12.     As additional support for the timely payment and performance of the Note, on December 3, 2012, Defendant Waino Pihl made and delivered an unlimited personal Guaranty of payment (the "Individual Guaranty"). **Exhibit D**.

13.     As additional support for the timely payment and performance of the Note, on December 8, 2017, Defendants Gratiot and JBT, each made and delivered an unlimited Guaranty of payment (collectively, the "Company Guaranties"). **Exhibit E**.

14.     The parties entered into a First Amendment to Loan Documents dated as of January 16, 2013, a Waiver and Amendment to Loan Documents dated as of November 27, 2013, an Amendment to Loan Documents dated as of July 16, 2014, an Amendment to Loan Documents dated as of December 8, 2017, effective as of November 30, 2017, and an Amendment to Loan Documents dated as of July 31, 2018, effective as of June 1, 2018 (collectively, "Amendments to Loan Documents"). **Exhibit F**.

15.     The Note, Loan Agreement, Security Agreement, Individual Guaranty, Company Guaranties, Amendments to Loan Documents, and all other related documents are referred to collectively as the "Loan Documents."

## THE DEFAULTS

16.      The Note matured on April 1, 2019.

17.     Defendant Mid Michigan Feed failed to timely pay the Note in full when it matured as agreed pursuant to the terms of the Note.

18.     Pursuant to its rights under the Loan Documents, Plaintiff demanded the full and immediate repayment of all sums owing from Defendants pursuant to the Note, Individual Guaranty and Company Guaranties.

19.     Despite demand for the full and immediate repayment of all sums owing under the Note, Defendants have failed, neglected and refused to repay the sums owing to Plaintiff pursuant to the Note, Individual Guaranty and Company Guaranties.

## COUNT I

## **BREACH OF NOTE**

20.     Plaintiff restates and incorporates the allegations set forth in Paragraphs 1 through 19 above by reference, with the same force and effect as if fully repeated.

21.     By its terms, the Note was to be repaid in ten equal consecutive monthly installments of principal and interest in the amount of $15,000.00 each, through April 1, 2019, when the outstanding principal and accrued interest was to paid in full to Plaintiff.

22.     Defendant Mid Michigan Feed failed to make payment to Plaintiff as and when agreed pursuant to the terms of the Note.

23.     The Note matured on April 1, 2019 and Plaintiff demanded the full and immediate repayment of all sums owing thereunder from Defendant Mid Michigan Feed.

24.     Despite demand, Defendant Mid Michigan Feed has failed, neglected and refused to repay the sums owing to Plaintiff pursuant to the Note.

25.     As of March 15, 2021, the principal sum of $565,756.21 was owing and due under the Note to Plaintiff, together with accrued and unpaid interest of $75,945.87, and late charges of $1,200.00, for a total, exclusive of additional costs and fees, of $642,902.08.

26.     Under the Note, Defendant Mid Michigan Feed agreed to pay all of Plaintiff's costs and expenses incurred in its collection, including reasonable attorney fees.

**WHEREFORE,** Plaintiff PNC Bank, National Association, requests that this Honorable Court enter judgment in its favor, and against Defendant, Mid Michigan Feed Ingredients, L.L.C., in the sum of $642,902.08, and award Plaintiff its costs and attorney fees incurred in the prosecution of this action, together with interest thereon as provided for by statute from and after March 15, 2021.

## COUNT II

## BREACH OF GUARANTIES

27.     Plaintiff restates and incorporates the allegations set forth in Paragraphs 1 through 26 above by reference, with the same force and effect as if fully repeated.

9

28.   As set forth in Count I above, Defendant Mid Michigan Feed is in default of its obligations to Plaintiff.

29.   By reason of the default by Defendant Mid Michigan Feed, as described above, Plaintiff is entitled to recover all sums owing under the Note from Defendants, Waino Pihl, Gratiot and JBT, jointly and severally, in accordance with the terms of their Individual Guaranty and Company Guaranties.

30.   Defendants, Waino Pihl, Gratiot and JBT have failed to honor the terms of their Individual Guaranty and Company Guaranties, by their failure to repay the sums owing under the Note, and despite demand therefor by Plaintiff.

31.   As of March 15, 2021, there remains a balance owing to Plaintiff on the Note, in the aggregate amount of $642,902.08, with further interest currently accruing thereon at the default rate specified in the Note, for which Defendants, Waino Pihl, Gratiot and JBT are liable pursuant to the terms of their Individual Guaranty and Company Guaranties.

32.   Pursuant to the terms of their Individual Guaranty and Company Guaranties, Defendants Waino Pihl, Gratiot and JBT, jointly and severally, agreed to reimburse Plaintiff for its costs and attorney fees incurred in the enforcement thereof.

**WHEREFORE,** Plaintiff PNC Bank, National Association, requests that this Honorable Court enter judgment in its favor, and against Defendants, Waino Pihl,

Gratiot Ag Investments, L.L.C. and JBT Grain Company, L.L.C., jointly and severally, in the sum of $642,902.08, and award Plaintiff its costs and attorney fees incurred in the prosecution of this action, together with interest thereon as provided for by statute from and after March 15, 2021.

**COUNT III**

**<u>CLAIM AND DELIVERY</u>**

33.     Plaintiff restates and incorporates the allegations set forth in Paragraphs 1 through 32 above by reference, with the same force and effect as if fully repeated.

34.     As set forth in Count I above, Defendant Mid Michigan Feed has failed to repay the sums owing to Plaintiff pursuant to the Note, despite demand having been made by Plaintiff.

35.     Pursuant to the terms of the Security Agreement and the Michigan Uniform Commercial Code, Plaintiff is entitled to possession of the Collateral upon the failure of Defendant Mid Michigan Feed to repay the Note as agreed.

36.     Plaintiff's security interest in the Collateral is senior to the interests of the Defendants and is perfected pursuant to financing and continuation statements filed with the Michigan Secretary of State on December 20, 2012 and July 3, 2017. Copies of the financing and continuation statements are attached as **<u>Exhibit G</u>**.

37.     The Collateral consists of independent pieces of property or a portion of divisible property of uniform kind, quality and value.

11

38.     The Collateral is not in the Defendants' custody by virtue of any execution or attachment against the personal property of Plaintiff, nor by virtue of any warrant for the collection of taxes, assessments or fines.

39.     The Collateral is presently subject to damage, accident, sale, deterioration due to the passage of time, depreciation, and disposal or dissipation by Defendant Mid Michigan Feed.

40.     Upon information and belief, the Collateral has an aggregate value which is less than the indebtedness owing to Plaintiff.

41.     Pursuant to the terms of the Security Agreement and the Loan Documents, Plaintiff is entitled to recover all costs, expenses and reasonable attorney fees from Defendant Mid Michigan Feed, which are incurred in locating and obtaining possession of the Collateral.

**WHEREFORE**, Plaintiff PNC Bank, National Association request that this Honorable Court:

A.     Issue an Order requiring Defendant Mid Michigan Feed to show cause why this Honorable Court should not order the Collateral to be delivered to Plaintiff forthwith, in accordance with MCR 3.105 and MCL §600.2920; and,

B.     Order and adjudge that Defendant Mid Michigan Feed immediately deliver an inventory of the Collateral to Plaintiff describing same by item, type and location, or permitting Plaintiff to perform same forthwith, together with an accounting of the proceeds realized from sales of same; and,

C.   Order and adjudge that Defendant Mid Michigan Feed deliver the Collateral to Plaintiff, or that Plaintiff be permitted to seize same within 21 days, pursuant to MCR 3.105(E)(4)(c); and,

D.   Order and adjudge Plaintiff to be authorized to dispose of the Collateral pursuant to MCL §440.9610; and,

E.   Enter judgment in favor of Plaintiff, and against Defendants Mid Michigan Feed, Waino Pihl, Gratiot and JBT, jointly and severally, for any deficiency that may exist after the disposition of the Collateral pursuant to Paragraph D above, together with costs, attorney fees and interest as provided for by statute; and,

F.   Determine the priority of the respective parties' interest in the Collateral; and,

G.   Grant Plaintiff any other relief as this Honorable Court shall deem just and appropriate.


**MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.**


DATED:  March 25, 2021

By: /s/ *MEGAN R.I. BAXTER*
    Joseph M. Ammar (P41972)
    Megan R.I. Baxter (P81945)
    Attorneys for Plaintiff
    150 W. Jefferson Ave.
    Suite 2500
    Detroit, MI 48226
    (269) 383-5810 / (313) 496-8459
    ammmar@millercanfield.com
    baxter@millercanfield.com

35924261.2/158913.00006

## <u>INDEX OF EXHIBITS TO COMPLAINT</u>

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Amended and Restated Term Note dated July 31, 2018 |
| B | Loan Agreement dated December 3, 2012 |
| C | Security Agreement dated December 3, 2012 |
| D | Guaranty and Suretyship Agreement of Waino Pihl dated December 3, 2012 |
| E | Guaranty and Suretyship Agreements of Gratiot Ag Investments, L.L.C. and JBT Grain Company, L.L.C. dated December 8, 2017 |
| F | Amendments to Loan Documents dated January 16, 2013, November 27, 2013, July 16, 2014, December 8, 2017 and July 31, 2018 |
| G | UCC Financing Statement filed December 20, 2012 and Continuation filed July 3, 2017 |

Exhibit A

# Amended and Restated
# Term Note

 **PNC**

$1,199,530.30

Execution Date: July _3/_ , 2018
Effective Date:  June 1, 2018

**FOR VALUE RECEIVED, MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**"), with an address at 4584 ½ W. Garfield Road, Middleton, Michigan 48856, promises to pay to the order of **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), in lawful money of the United States of America in immediately available funds at its offices located at 2322 Tittabawassee Road, Saginaw, Michigan 48604, or at such other location as the Bank may designate from time to time, the principal sum of **ONE MILLION ONE HUNDRED NINETY-NINE THOUSAND FIVE HUNDRED THIRTY AND 30/100 DOLLARS ($1,199,530.30)** (the "**Facility**"), together with interest accruing on the outstanding principal balance from the date hereof, all as provided below.

1.    **Rate of Interest.**  From the Effective Date of June 1, 2018 until the Execution Date indicated above ("**Execution Date**"), amounts outstanding under this Note will bear interest at a rate per annum which is at all times equal to the Base Rate plus twenty-five (25) basis points (0.25%).  From and after the Execution Date, amounts outstanding under this Note will bear interest at a rate per annum which is at all times equal to the Base Rate plus seventy-five (75) basis points (0.75%). Interest will be calculated based on the actual number of days that principal is outstanding over a year of 360 days.  In no event will the rate of interest hereunder exceed the maximum rate allowed by law.

For purposes hereof, the following terms shall have the following meanings:

"**Base Rate**" shall mean the Prime Rate.

"**Business Day**" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Saginaw, Michigan.

"**Prime Rate**" shall mean the rate publicly announced by the Bank from time to time as its prime rate. The Prime Rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers.  The Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

2.    **Payment Terms.**  Principal and interest shall be due and payable in ten (10) equal consecutive monthly installments in the amount of $15,000.00 each (the "**Level Payment Amount**"), commencing on June 1, 2018, and continuing on the 1st day of each month thereafter.  Any outstanding principal and accrued interest shall be due and payable in full on April 1, 2019 (the "**Maturity Date**").  The Level Payment Amount is calculated on the assumption that each periodic payment will be made on the date when due, and if there is any variation in the actual payment dates, there may be an additional amount due upon maturity of this Note.  Any amortization schedule provided to Borrower is only an estimate, and is superseded by the terms of this Note regarding the accrual and payment of interest.  The Level Payment Amount may be adjusted upward from time to time by the Bank in its discretion if: (a) because of changes in the interest rate, the Level Payment Amount becomes insufficient to repay all accrued interest for any payment period or would result in an increased payment on the

**Form 8E – MI (NCOJ)  Rev. 9/17**

Maturity Date; or (b) any payment(s) are made by the Borrower after their respective due date(s).  Otherwise any Level Payment Amount may be adjusted by the Bank as of January 1st of each year to reflect changes in the applicable interest rate.  The Level Payment Amount as adjusted by the Bank from time to time shall, at the time of such adjustment, be in an amount sufficient to fully amortize the then outstanding balance of this Note based on the then remaining amortization term.

If any payment under this Note shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.  The Borrower hereby authorizes the Bank to charge the Borrower's deposit account at the Bank for any payment when due hereunder.  If the Borrower revokes this authorization for any reason whatsoever or fails to maintain a deposit account with the Bank which may be charged, the Bank may, at its option, upon thirty (30) days' notice to the Borrower, increase the interest rate payable by the Borrower under this Note by twenty-five (25) basis points (0.25%).  Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order the Bank may choose, in its sole discretion.

**3.**      **Late Payments; Default Rate.**  If the Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note within fifteen (15) calendar days of the date due and payable, the Borrower also shall pay to the Bank a late charge equal to the lesser of five percent (5%) of the amount of such payment or $100.00 (the "**Late Charge**").  Such fifteen (15) day period shall not be construed in any way to extend the due date of any such payment.  Upon maturity, whether by acceleration, demand or otherwise, and at the Bank's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, each advance outstanding under this Note shall bear interest at a rate per annum (based on the actual number of days that principal is outstanding over a year of 360 days) which shall be three percentage points (3%) in excess of the interest rate in effect from time to time under this Note but not more than the maximum rate allowed by law (the "**Default Rate**").  The Default Rate shall continue to apply whether or not judgment shall be entered on this Note.  Both the Late Charge and the Default Rate are imposed as liquidated damages for the purpose of defraying the Bank's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, the Bank's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which the Bank may employ.  In addition, the Default Rate reflects the increased credit risk to the Bank of carrying a loan that is in default.  The Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by the Bank, and that the actual harm incurred by the Bank cannot be estimated with certainty and without difficulty.

**4.**      **Prepayment.**  The indebtedness evidenced by this Note may be prepaid in whole or in part at any time without penalty.

**5.**      **Increased Costs; Yield Protection.**   On written demand, together with written evidence of the justification therefor, the Borrower agrees to pay the Bank all direct costs incurred, any losses suffered or payments made by the Bank as a result of any Change in Law (hereinafter defined), imposing any reserve, deposit, allocation of capital or similar requirement (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System) on the Bank, its holding company or any of their respective assets relative to the Facility.   "**Change in Law**" means the occurrence, after the date of this Note, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any governmental authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

- 2 -

6.    **Other Loan Documents.**  This Note is issued in connection with an amendment to loan documents between the Borrower and the Bank, dated on or before the date hereof, and the other agreements and documents executed and/or delivered in connection therewith or referred to therein, the terms of which are incorporated herein by reference (as amended, modified or renewed from time to time, collectively the "**Loan Documents**"), and is secured by the property (if any) described in the Loan Documents and by any and all mortgages, security agreements, assignments, loan agreements, pledge agreements and other documents or instruments evidencing a security interest or other lien in favor of the Bank and delivered by the Borrower or by any third party with reference to indebtedness of the Borrower, whether such documents were previously or are hereafter executed, and whether given expressly as security for payment of this Note or generally as security for any and all indebtedness of the Borrower to the Bank.   Such documents may be executed contemporaneously with the execution of this Note, or they may be executed and delivered at another time.   Collateral securing other obligations of Borrower to the Bank may also secure this Note.

7.    **Events of Default.**  The occurrence of any of the following events will be deemed to be an "**Event of Default**" under this Note:  (i) the nonpayment of any principal, interest or other indebtedness under this Note when due; (ii) the occurrence of any event of default or any default and the lapse of any notice or cure period, or any Obligor's failure to observe or perform any covenant or other agreement, under or contained in any Loan Document or any other document now or in the future evidencing or securing any debt, liability or obligation of any Obligor to the Bank; (iii) the filing by or against any Obligor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against any Obligor, such proceeding is not dismissed or stayed within 30 days of the commencement thereof, provided that the Bank shall not be obligated to advance additional funds hereunder during such period); (iv) any assignment by any Obligor for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by or deposited with the Bank; (v) a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt; (vi) the commencement of any foreclosure or forfeiture proceeding, execution or attachment against any collateral securing the obligations of any Obligor to the Bank; (vii) the entry of a final judgment against any Obligor and the failure of such Obligor to discharge the judgment within ten (10) days of the entry thereof; (viii) any change in any Obligor's business, assets, operations, financial condition or results of operations that has or could reasonably be expected to have any material adverse effect on any Obligor; (ix) any Obligor ceases doing business as a going concern; (x) any representation or warranty made by any Obligor to the Bank in any Loan Document or any other documents now or in the future evidencing or securing the obligations of any Obligor to the Bank, is false, erroneous or misleading in any material respect; (xi) if this Note or any guarantee executed by any Obligor is secured, the failure of any Obligor to provide the Bank with additional collateral if in the Bank's opinion at any time or times, the market value of any of the collateral securing this Note or any guarantee has depreciated below that required pursuant to the Loan Documents or, if no specific value is so required, then in an amount deemed material by the Bank; (xii) the revocation or attempted revocation, in whole or in part, of any guarantee by any Obligor; or (xiii) the death, incarceration, indictment or legal incompetency of any individual Obligor or, if any Obligor is a partnership or limited liability company, the death, incarceration, indictment or legal incompetency of any individual general partner or member.   As used herein, the term "**Obligor**" means any Borrower and any guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Borrower's obligations to the Bank existing on the date of this Note or arising in the future.

Upon the occurrence of an Event of Default:  (a) the Bank shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in clause (iii) or (iv) above shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind; (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at the Bank's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at the Bank's option, this Note will bear interest at the Default Rate from the

date of the occurrence of the Event of Default; and (e) the Bank may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law.

**8.** **Right of Setoff.** In addition to all liens upon and rights of setoff against the Borrower's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Borrower's obligations to the Bank under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Borrower hereby grants the Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank, all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

**9.** **Anti-Money Laundering/International Trade Law Compliance.** The Borrower represents and warrants to the Bank, as of the date of this Note, the date of each advance of proceeds under the Facility, the date of any renewal, extension or modification of the Facility, and at all times until the Facility has been terminated and all amounts thereunder have been indefeasibly paid in full, that: (a) no Covered Entity (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority; (b) the proceeds of the Facility will not be used to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any law, regulation, order or directive enforced by any Compliance Authority; (c) the funds used to repay the Facility are not derived from any unlawful activity; and (d) each Covered Entity is in compliance with, and no Covered Entity  engages in any dealings or transactions prohibited by, any laws of the United States, including but not limited to any Anti-Terrorism Laws. Borrower covenants and agrees that it shall immediately notify the Bank in writing upon the occurrence of a Reportable Compliance Event.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means the Borrower, its affiliates and subsidiaries, all guarantors, pledgors of collateral, all owners of the foregoing, and all brokers or other agents of the Borrower acting in any capacity in connection with the Facility; "**Reportable Compliance Event**" means that any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority; and "**Sanctioned Person**" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

Form 8E – MI (NCOJ) Rev. 9/17

**10.     Indemnity.**  The Borrower agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the "**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct.  The indemnity agreement contained in this Section shall survive the termination of this Note, payment of any advance hereunder and the assignment of any rights hereunder.  The Borrower may participate at its expense in the defense of any such action or claim.

**11.     Miscellaneous.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as may be agreed otherwise above with respect to borrowing requests or as otherwise provided in this Note) and will be effective upon receipt.  Notices may be given in any manner to which the parties may agree.  Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  In addition, the parties agree that Notices may be sent electronically to any electronic address provided by a party from time to time.  Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this paragraph.  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Note will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Note for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).  The Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by the Bank in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of the Bank's counsel.  If any provision of this Note is found to be invalid, illegal or unenforceable in any respect by a court, all the other provisions of this Note will remain in full force and effect.  The Borrower and all other makers and indorsers of this Note hereby forever waive presentment, protest, notice of dishonor and notice of non-payment.  The Borrower also waives all defenses based on suretyship or impairment of collateral.  If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several.  This Note shall bind the Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of the Bank and its successors and assigns; provided, however, that the Borrower may not assign this Note in whole or in part without the Bank's written consent and the Bank at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located.  THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN EFFECT IN THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED (OR, TO THE EXTENT

Form 8E – MI (NCOJ)  Rev. 9/17

CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT). The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Note will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction. The Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Borrower. The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

**12.**     **Commercial Purpose.**  The Borrower represents that the indebtedness evidenced by this Note is being incurred by the Borrower solely for the purpose of acquiring or carrying on a business, professional or commercial activity, and not for personal, family or household purposes.

**13.**     **USA PATRIOT Act Notice.**  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each Borrower that opens an account. What this means: when the Borrower opens an account, the Bank will ask for the business name, business address, taxpayer identifying number and other information that will allow the Bank to identify the Borrower, such as organizational documents. For some businesses and organizations, the Bank may also need to ask for identifying information and documentation relating to certain individuals associated with the business or organization.

**14.**     **Authorization to Obtain Credit Reports.**  By signing below, each Borrower who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the Borrower's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Note and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

**15.**     **Electronic Signatures and Records.**  Notwithstanding any other provision herein, the Borrower agrees that this Note, the Loan Documents, any amendments thereto, and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

**16.**     **Depository.**  The Borrower will establish and maintain with the Bank the Borrower's primary depository accounts. If the Borrower fails to establish and/or maintain its primary depository accounts with the Bank, the Bank may, at its option, upon thirty (30) days' notice to the Borrower, increase the interest rate payable by the Borrower under this Note by up to 1.00 percentage points (1.00%). The Bank's right to increase the interest rate pursuant to this paragraph shall be in addition to any other rights or remedies the Bank may have under this Note, all of which are hereby reserved, and shall not constitute a waiver, release or limitation upon the Bank's exercise of any such rights or remedies.

17.     **Amendment and Restatement.**  This Note amends and restates, and is in substitution for, that certain Amended and Restated Term Note in the original principal amount of $1,250,000.00 payable to the order of the Bank and dated as of December 8, 2017, effective as of November 30, 2017 (the "**Existing Note**"). However, without duplication, this Note shall in no way extinguish, cancel or satisfy Borrower's unconditional obligation to repay all indebtedness evidenced by the Existing Note or constitute a novation of the Existing Note. Nothing herein is intended to extinguish, cancel or impair the lien priority or effect of any security agreement, pledge agreement or mortgage with respect to any Obligor's obligations hereunder and under any other document relating hereto. This Note, and all terms and provisions hereof, shall be effective as of June 1, 2018 (the "**Effective Date**").

**Form 8E – MI (NCOJ)  Rev. 9/17**

18.   <u>**WAIVER OF JURY TRIAL**</u>.  THE BORROWER IRREVOCABLY WAIVES ANY AND ALL RIGHTS THE BORROWER MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS NOTE, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS NOTE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.  THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

**The Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.**

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

WITNESS / ATTEST:

**MID MICHIGAN FEED INGREDIENTS, L.L.C.**

_Keary A Richardson_

By: _Waino Pihl_ _____
                                         (SEAL)

Print Name: _Keary A. Richardson_

Title: _Accountant_
(Include title only if an officer of entity signing to the right)

Name:  Waino Pihl

Title:    Member

Open.21511.73997.20555685-2

- 7 -

**Form 8E – MI (NCOJ)  Rev. 9/17**

Exhibit B

*580*
*CL*

# Loan Agreement



THIS LOAN AGREEMENT (the "**Agreement**"), is entered into as of December  **3** , 2012, between **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**"), with an address at 102 South Robinson Street, Perrinton, Michigan 48871, and **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at 2322 Tittabawassee Road, Saginaw, Michigan 48604.

The Borrower and the Bank, with the intent to be legally bound, agree as follows:

**1.**      **Loan.** The Bank has made or may make one or more loans (collectively, the "**Loan**") to the Borrower subject to the terms and conditions and in reliance upon the representations and warranties of the Borrower set forth in this Agreement. The Loan is or will be evidenced by a promissory note or notes of the Borrower and all renewals, extensions, amendments and restatements thereof (if one or more, collectively, the "**Note**") acceptable to the Bank, which shall set forth the interest rate, repayment and other provisions, the terms of which are incorporated into this Agreement by reference. The Loans governed by this Agreement shall include, but are not limited to, the following:

     **1.1.**    **Committed Line of Credit.** A committed revolving line of credit under which the Borrower may request and the Bank, subject to the terms and conditions of this Agreement, will make advances to the Borrower from time to time until the Expiration Date, in an amount in the aggregate at any time outstanding not to exceed **$4,000,000.00** (the "**Line of Credit**"). The "**Expiration Date**" means December  **3** , 2013, or such later date as may be designated by the Bank by written notice from the Bank to the Borrower. Advances under the Line of Credit will be used for working capital or other general corporate purposes of the Borrower.

     **1.1.1.**    **Working Cash® Feature.** The Line of Credit includes an investment and borrowing sweep feature on the terms and conditions of that certain Working Cash®, Line of Credit, Investment Sweep Rider (the "**Sweep Rider**"), to be executed and delivered by the Borrower to the Bank in form and substance satisfactory to the Bank, the terms of which are hereby incorporated in this Agreement by reference. The Sweep Rider will remain in effect until such time (if any) as it is terminated in accordance with its terms.

     **1.1.2.**    **Borrowing Base.** The availability of advances under the Line of Credit will be subject to a borrowing base formula and other provisions as set forth in a Borrowing Base Rider dated as of even date herewith between the Borrower and the Bank, the terms of which are incorporated herein by reference (the "**Borrowing Base Rider**"). At no time shall the sum of outstanding advances under the Line of Credit exceed the Borrowing Base (as defined in the Borrowing Base Rider). Pursuant to the Borrowing Base Rider, the Borrower will be required to deliver periodic Borrowing Base Certificates, reporting on its inventory in accordance with defined eligibility standards, as a condition to advances under this Agreement.

**2.**      **Security.** The security for repayment of the Loan shall include but not be limited to the collateral, guaranties and other documents heretofore, contemporaneously or hereafter executed and delivered to the Bank (the "**Security Documents**"), which shall secure repayment of the Loan, the Note and all other loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising

under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, or (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements; and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of the Bank incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses (hereinafter referred to collectively as the **"Obligations"**). Unless expressly provided to the contrary in documentation for any other loan or loans, it is the express intent of the Bank and the Borrower that all Obligations including those included in the Loan are cross-collateralized and cross-defaulted, such that collateral securing any of the Obligations shall secure repayment of all Obligations and a default under any Obligation shall be a default under all Obligations.

This Agreement, the Note, the Security Documents and all other agreements and documents executed and/or delivered pursuant hereto, as each may be amended, modified, extended or renewed from time to time, are collectively referred to as the **"Loan Documents."** Capitalized terms not defined herein shall have the meanings ascribed to them in the Loan Documents.

**3.** **Representations and Warranties.** The Borrower hereby makes the following representations and warranties, which shall be continuing in nature and remain in full force and effect until the Obligations are paid in full, and which shall be true and correct except as otherwise set forth on the Addendum attached hereto and incorporated herein by reference (the **"Addendum"**):

**3.1.** **Existence, Power and Authority.** If not a natural person, the Borrower is duly organized, validly existing and in good standing under the laws of the State of its incorporation or organization and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on, and is duly qualified, licensed and in good standing to do business in all jurisdictions where its ownership of property or the nature of its business requires such qualification or licensing. The Borrower is duly authorized to execute and deliver the Loan Documents, all necessary action to authorize the execution and delivery of the Loan Documents has been properly taken, and the Borrower is and will continue to be duly authorized to borrow under this Agreement and to perform all of the other terms and provisions of the Loan Documents.

**3.2.** **Financial Statements.** If the Borrower is not a natural person, it has delivered or caused to be delivered to the Bank its most recent balance sheet, income statement and statement of cash flows, or if the Borrower is a natural person, its personal financial statement and tax returns (as applicable, the **"Historical Financial Statements"**). The Historical Financial Statements are true, complete and accurate in all material respects and fairly present the financial condition, assets and liabilities, whether accrued, absolute, contingent or otherwise and the results of the Borrower's operations for the period specified therein. The Historical Financial Statements have been prepared in accordance with generally accepted accounting principles (**"GAAP"**) consistently applied from period to period, subject in the case of interim statements to normal year-end adjustments and to any comments and notes acceptable to the Bank in its sole discretion.

**3.3.** **No Material Adverse Change.** Since the date of the most recent Financial Statements (as hereinafter defined), the Borrower has not suffered any damage, destruction or loss, and no event or condition has occurred or exists, which has resulted or could result in a material adverse change in its business, assets, operations, condition (financial or otherwise) or results of operation.

Form 7G - Multistate Rev. 9/12

**3.4.   Binding Obligations.** The Borrower has full power and authority to enter into the transactions provided for in this Agreement and has been duly authorized to do so by appropriate action of its Board of Directors if the Borrower is a corporation, all its general partners if the Borrower is a partnership or otherwise as may be required by law, charter, other organizational documents or agreements; and the Loan Documents, when executed and delivered by the Borrower, will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms.

**3.5.   No Defaults or Violations.** There does not exist any Event of Default under this Agreement or any default or violation by the Borrower of or under any of the terms, conditions or obligations of: (i) its partnership agreement if the Borrower is a partnership, its articles or certificate of incorporation, regulations or bylaws if the Borrower is a corporation or its other organizational documents as applicable; (ii) any indenture, mortgage, deed of trust, franchise, permit, contract, agreement, or other instrument to which it is a party or by which it is bound; or (iii) any law, ordinance, regulation, ruling, order, injunction, decree, condition or other requirement applicable to or imposed upon it by any law, the action of any court or any governmental authority or agency; and the consummation of this Agreement and the transactions set forth herein will not result in any such default or violation or Event of Default.

**3.6.   Title to Assets.** The Borrower has good and marketable title to the assets reflected on the most recent Financial Statements, free and clear of all liens and encumbrances, except for (i) current taxes and assessments not yet due and payable, (ii) assets disposed of by the Borrower in the ordinary course of business since the date of the most recent Financial Statements, and (iii) those liens or encumbrances, if any, specified on the Addendum.

**3.7.   Litigation.** There are no actions, suits, proceedings or governmental investigations pending or, to the knowledge of the Borrower, threatened against the Borrower, which could result in a material adverse change in its business, assets, operations, condition (financial or otherwise) or results of operations and there is no basis known to the Borrower for any action, suit, proceeding or investigation which could result in such a material adverse change.  All pending and threatened litigation against the Borrower is listed on the Addendum.

**3.8.   Tax Returns.** The Borrower has filed all returns and reports that are required to be filed by it in connection with any federal, state or local tax, duty or charge levied, assessed or imposed upon it or its property or withheld by it, including income, unemployment, social security and similar taxes, and all of such taxes have been either paid or adequate reserve or other provision has been made therefor.

**3.9.   Employee Benefit Plans.** Each employee benefit plan as to which the Borrower may have any liability complies in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974 (as amended from time to time, **"ERISA"**), including minimum funding requirements, and (i) no Prohibited Transaction (as defined under ERISA) has occurred with respect to any such plan, (ii) no Reportable Event (as defined under Section 4043 of ERISA) has occurred with respect to any such plan which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Section 4042 of ERISA, (iii) the Borrower has not withdrawn from any such plan or initiated steps to do so, and (iv) no steps have been taken to terminate any such plan.

**3.10.   Environmental Matters.** The Borrower is in compliance, in all material respects, with all Environmental Laws (as hereinafter defined), including, without limitation, all Environmental Laws in jurisdictions in which the Borrower owns or operates, or has owned or operated, a facility or site, stores Collateral, arranges or has arranged for disposal or treatment of hazardous substances, solid waste or other waste, accepts or has accepted for transport any hazardous substances, solid waste or other wastes or holds or has held any interest in real property or otherwise.  Except as otherwise disclosed on the Addendum, no litigation or proceeding arising under, relating to or in connection with any Environmental Law is pending or, to the best of the Borrower's knowledge, threatened against the Borrower, any real property which the Borrower holds or has held an interest or any past or present operation of the Borrower.  No release, threatened release or disposal of

hazardous waste, solid waste or other wastes is occurring, or to the best of the Borrower's knowledge has occurred, on, under or to any real property in which the Borrower holds or has held any interest or performs or has performed any of its operations, in violation of any Environmental Law. As used in this Section, **"litigation or proceeding"** means any demand, claim notice, suit, suit in equity, action, administrative action, investigation or inquiry whether brought by a governmental authority or other person, and **"Environmental Laws"** means all provisions of laws, statutes, ordinances, rules, regulations, permits, licenses, judgments, writs, injunctions, decrees, orders, awards and standards promulgated by any governmental authority concerning health, safety and protection of, or regulation of the discharge of substances into, the environment.

      **3.11.** **Intellectual Property.** The Borrower owns or is licensed to use all patents, patent rights, trademarks, trade names, service marks, copyrights, intellectual property, technology, know-how and processes necessary for the conduct of its business as currently conducted that are material to the condition (financial or otherwise), business or operations of the Borrower.

      **3.12.** **Regulatory Matters.** No part of the proceeds of the Loan will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time in effect or for any purpose which violates the provisions of the Regulations of such Board of Governors.

      **3.13.** **Solvency.** As of the date hereof and after giving effect to the transactions contemplated by the Loan Documents, (i) the aggregate value of the Borrower's assets will exceed its liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), (ii) the Borrower will have sufficient cash flow to enable it to pay its debts as they become due, and (iii) the Borrower will not have unreasonably small capital for the business in which it is engaged.

      **3.14.** **Disclosure.** None of the Loan Documents contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary in order to make the statements contained in this Agreement or the Loan Documents not misleading. There is no fact known to the Borrower which materially adversely affects or, so far as the Borrower can now foresee, might materially adversely affect the business, assets, operations, condition (financial or otherwise) or results of operation of the Borrower and which has not otherwise been fully set forth in this Agreement or in the Loan Documents.

    **4.** **Affirmative Covenants.** The Borrower agrees that from the date of execution of this Agreement until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, the Borrower will:

      **4.1.** **Books and Records.** Maintain books and records in accordance with GAAP and give representatives of the Bank access thereto at all reasonable times, including permission to examine, copy and make abstracts from any of such books and records and such other information as the Bank may from time to time reasonably request, and the Borrower will make available to the Bank for examination copies of any reports, statements and returns which the Borrower may make to or file with any federal, state or local governmental department, bureau or agency.

      **4.2.** **Interim Financial Statements; Certificate of No Default.** Furnish the Bank within 45 days after the end of each quarter the Borrower's Financial Statements for such period, in reasonable detail, certified by an authorized officer of the Borrower and prepared in accordance with GAAP consistently applied from period to period. The Borrower shall also deliver a certificate as to its compliance with applicable financial covenants (containing detailed calculations of all financial covenants) for the period then ended and whether any Event of Default exists, and, if so, the nature thereof and the corrective measures the Borrower proposes to take. As used in this Agreement, **"Financial Statements"** means the Borrower's consolidated and, if required by the Bank in its sole discretion, consolidating balance sheets, income statements and statements of cash flows for the year, month or quarter together with year-to-date figures and comparative figures for the corresponding periods of the prior year.

- 4 -

**4.3.** **Annual Financial Statements.** Furnish the Borrower's Financial Statements to the Bank within 120 days after the end of each fiscal year. Those Financial Statements will be prepared on a compiled basis in accordance with GAAP by an independent certified public accountant selected by the Borrower and satisfactory to the Bank.

**4.4.** **Accounts Receivable/Payable Agings.** Borrower shall furnish the Bank not later than 20 days after the end of each month Borrower's detailed schedule of accounts receivable and accounts payable aging analysis, in form and substance satisfactory to Bank.

**4.5.** **Financial Reporting – Individual Guarantor.** With respect to (i) Waino Pihl, (ii) Kelvin Duflo, (iii) Kim Duflo, and (iv) Kris D. Duflo (each an "**Individual Guarantors**"), furnish the Bank (a) not later than 120 days after the end of each calendar year an updated personal financial statement of Individual Guarantors; and (b) a copy of the federal income tax return filed by Individual Guarantors, which tax return shall be a true and complete copy of the return filed by Individual Guarantors with the Internal Revenue Service, not later than 5 days after filing but in any event not later than 270 days after the end of each calendar year. In addition, Bank may, from time to time, require any Individual Guarantors to deliver additional financial information.

**4.6.** **Payment of Taxes and Other Charges.** Pay and discharge when due all indebtedness and all taxes, assessments, charges, levies and other liabilities imposed upon the Borrower, its income, profits, property or business, except those which currently are being contested in good faith by appropriate proceedings and for which the Borrower shall have set aside adequate reserves or made other adequate provision with respect thereto acceptable to the Bank in its sole discretion.

**4.7.** **Maintenance of Existence, Operation and Assets.** Do all things necessary to (i) maintain, renew and keep in full force and effect its organizational existence and all rights, permits and franchises necessary to enable it to continue its business as currently conducted; (ii) continue in operation in substantially the same manner as at present; (iii) keep its properties in good operating condition and repair; and (iv) make all necessary and proper repairs, renewals, replacements, additions and improvements thereto.

**4.8.** **Insurance.** Maintain, with financially sound and reputable insurers, insurance with respect to its property and business against such casualties and contingencies, of such types and in such amounts, as is customary for established companies engaged in the same or similar business and similarly situated. In the event of a conflict between the provisions of this Section and the terms of any Security Documents relating to insurance, the provisions in the Security Documents will control.

**4.9.** **Compliance with Laws.** Comply with all laws applicable to the Borrower and to the operation of its business (including without limitation any statute, ordinance, rule or regulation relating to employment practices, pension benefits or environmental, occupational and health standards and controls).

**4.10.** **Bank Accounts.** Establish and maintain at the Bank the Borrower's primary depository accounts.

**4.11.** **Financial Covenants.** Comply with all of the financial and other covenants, if any, set forth on the Addendum.

**4.12.** **Additional Reports.** Provide prompt written notice to the Bank of the occurrence of any of the following (together with a description of the action which the Borrower proposes to take with respect thereto): (i) any Event of Default or any event, act or condition which, with the passage of time or the giving of notice, or both, would constitute an Event of Default (a "Default"), (ii) any litigation filed by or against the Borrower, (iii) any Reportable Event or Prohibited Transaction with respect to any Employee Benefit Plan(s) (as

defined in ERISA) or (iv) any event which might result in a material adverse change in the business, assets, operations, condition (financial or otherwise) or results of operation of the Borrower.

5.    **Negative Covenants.**  The Borrower covenants and agrees that from the date of this Agreement until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, except as set forth in the Addendum, the Borrower will not, without the Bank's prior written consent:

5.1.    **Indebtedness.**  Create, incur, assume or suffer to exist any indebtedness for borrowed money other than:  (i) the Loan and any subsequent indebtedness to the Bank; and (ii) open account trade debt incurred in the ordinary course of business and not past due.

5.2.    **Liens and Encumbrances.**  Except as provided in Section 3.6, create, assume, incur or permit to exist any mortgage, pledge, encumbrance, security interest, lien or charge of any kind upon any of its property, now owned or hereafter acquired, or acquire or agree to acquire any kind of property subject to any conditional sales or other title retention agreement, except liens securing purchase money indebtedness permitted pursuant to Section 5.1 above.

5.3.    **Guarantees.**  Guarantee, endorse or become contingently liable for the obligations of any person, firm, corporation or other entity, except in connection with the endorsement and deposit of checks in the ordinary course of business for collection.

5.4.    **Loans or Advances.**  Purchase or hold beneficially any stock, other securities or evidences of indebtedness of, or make or have outstanding, any loans or advances to, or otherwise extend credit to, or make any investment or acquire any interest whatsoever in, any other person, firm, corporation or other entity, except investments disclosed on the Borrower's Historical Financial Statements or acceptable to the Bank in its sole discretion.

5.5.    **Merger or Transfer of Assets.**  Liquidate or dissolve, or merge or consolidate with or into any person, firm, corporation or other entity, or sell, lease, transfer or otherwise dispose of all or any substantial part of its property, assets, operations or business, whether now owned or hereafter acquired.

5.6.    **Change in Business, Management or Ownership.**  Make or permit, and cause each Guarantor under the Security Documents not to make or permit, any change in its form of organization, the nature of its business as carried on as of the date hereof, in the composition of its current executive management, or in its equity ownership.

5.7.    **Dividends.**  Declare or pay any dividends on or make any distribution with respect to any class of its equity or ownership interest, or purchase, redeem, retire or otherwise acquire any of its equity, provided, however, that so long as the Borrower remains an S corporation, a partnership or a limited liability company, it may make distributions to its shareholders, partners or members, as the case may be, in an amount equal to the federal and state income tax of such principals of the Borrower attributable to the earning of the Borrower.

5.8.    **Acquisitions.**  Make acquisitions of all or substantially all of the property or assets of any person, firm, corporation or other entity.

6.    **Events of Default.**  The occurrence of any of the following will be deemed to be an **Event of Default**:

6.1.    **Covenant Default.**  The Borrower shall default in the performance of any of the covenants or agreements contained in this Agreement.

- 6 -

**6.2.** **Breach of Warranty.** Any Financial Statement, representation, warranty or certificate made or furnished by the Borrower to the Bank in connection with this Agreement shall be false, incorrect or incomplete when made.

**6.3.** **Other Default.** The occurrence of an Event of Default as defined in the Note or any of the Loan Documents.

Upon the occurrence of an Event of Default, the Bank will have all rights and remedies specified in the Note and the Loan Documents and all rights and remedies (which are cumulative and not exclusive) available under applicable law or in equity.

**7.** **Conditions.** The Bank's obligation to make any advance under the Loan is subject to the conditions that as of the date of the advance:

**7.1.** **No Event of Default.** No Event of Default or event which with the passage of time, the giving of notice or both would constitute an Event of Default shall have occurred and be continuing;

**7.2.** **Authorization Documents.** The Bank shall have received certified copies of resolutions of the board of directors, the general partners or the members or managers of any partnership, corporation or limited liability company that executes this Agreement, the Note or any of the other Loan Documents; or other proof of authorization satisfactory to the Bank; and

**7.3.** **Receipt of Loan Documents.** The Bank shall have received the Loan Documents and such other instruments and documents which the Bank may reasonably request in connection with the transactions provided for in this Agreement, which may include an opinion of counsel in form and substance satisfactory to the Bank for any party executing any of the Loan Documents.

**8.** **Expenses.** The Borrower agrees to pay the Bank, upon the execution of this Agreement, and otherwise on demand, all costs and expenses incurred by the Bank in connection with the preparation, negotiation and delivery of this Agreement and the other Loan Documents, and any modifications thereto, and the collection of all of the Obligations, including but not limited to enforcement actions, relating to the Loan, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to this Agreement, including reasonable fees and expenses of counsel (which may include costs of in-house counsel), expenses for auditors, appraisers and environmental consultants, lien searches, recording and filing fees and taxes.

**9.** **Increased Costs.** On written demand, together with written evidence of the justification therefor, the Borrower agrees to pay the Bank all direct costs incurred and any losses suffered or payments made by the Bank as a consequence of making the Loan by reason of any change in law or regulation, or the interpretation thereof, imposing any reserve, deposit, allocation of capital or similar requirement (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System) on the Bank, its holding company or any of their respective assets.

**10.** **Miscellaneous.**

**10.1.** **Notices**: All notices, demands, requests, consents, approvals and other communications required or permitted hereunder **("Notices")** must be in writing and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this section.

**10.2.**   **Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank s action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.

**10.3.**   **Illegality.**  If any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Agreement.

**10.4.**   **Changes in Writing.**   No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Agreement will be effective unless made in a writing signed by the party to be charged, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Agreement or any of the other Loan Documents for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).  No notice to or demand on the Borrower will entitle the Borrower to any other or further notice or demand in the same, similar or other circumstance.

**10.5.**   **Entire Agreement.**  This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**10.6.**   **Counterparts.**  This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart.  Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

**10.7.**   **Successors and Assigns.**  This Agreement will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Borrower may not assign this Agreement in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Agreement in whole or in part.

**10.8.**   **Interpretation.**  In this Agreement, unless the Bank and the Borrower otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement.  Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  Unless otherwise specified in this Agreement, all accounting terms shall be interpreted and all accounting determinations shall be made in accordance with GAAP. If this Agreement is executed by more than one party as Borrower, the obligations of such persons or entities will be joint and several.

**10.9.**   **No Consequential Damages, Etc.**  The Bank will not be responsible for any damages, consequential, incidental, special, punitive or otherwise, that may be incurred or alleged by any person or entity, including the Borrower and any Guarantor, as a result of this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, or the use of the proceeds of the Loan.

- 8 -

**10.10.   Assignments and Participations.**   At any time, without any notice to the Borrower, the Bank may sell, assign, transfer, negotiate, grant participations in, or otherwise dispose of all or any part of the Bank's interest in the Loan.  The Borrower hereby authorizes the Bank to provide, without any notice to the Borrower, any information concerning the Borrower, including information pertaining to the Borrower's financial condition, business operations or general creditworthiness, to any person or entity which may succeed to or participate in all or any part of the Bank's interest in the Loan.

**10.11.   Governing Law and Jurisdiction.**   This Agreement has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located.  THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES.  The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Agreement will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction.  The Bank and the Borrower agree that the venue provided above is the most convenient forum for both the Bank and the Borrower.  The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

**10.12.   WAIVER OF JURY TRIAL.   EACH OF THE BORROWER AND THE BANK IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.   THE BORROWER AND THE BANK ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

**The Borrower acknowledges that it has read and understood all the provisions of this Agreement, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.**

**WITNESS** the due execution hereof as a document under seal, as of the date first written above.


WITNESS / ATTEST:

**MID MICHIGAN FEED INGREDIENTS, L.L.C.**

_Fred T. Mitchell_

By (x) _Waino Pihl_
(SEAL)

Print Name:  _Fred T. Mitchell_
Title:_____
(Include title only if an officer of entity signing to the right)

Waino Pihl
Managing Member


PNC BANK, NATIONAL ASSOCIATION

By:  _Frederick T. Mitchell_
(SEAL)

Frederick T. Mitchell, Jr.
Senior Vice President

- 9 -

Form 7G - Multistate Rev. 9/12

**ADDENDUM** to that certain Loan Agreement dated December _3_, 2012 between **MID MICHIGAN FEED INGREDIENTS, L.L.C.** as the Borrower and PNC Bank, National Association, as the Bank. Capitalized terms used in this Addendum and not otherwise defined shall have the meanings given them in the Agreement.  Section numbers below refer to the sections of the Agreement.

3.6     **Title to Assets.** Describe additional liens and encumbrances below:

3.7     **Litigation.** Describe pending and threatened litigation, investigations, proceedings, etc. below:

Form 7G - Multistate Rev. 9/12

CONTINUATION OF ADDENDUM

## **<u>FINANCIAL COVENANTS</u>**

(1)     The Borrower will maintain at all times a Tangible Net Worth of $900,000.00.

As used herein:

**"Tangible Net Worth"** means stockholders' equity in the Borrower <u>less</u> all items properly classified as intangibles and related receivables**.**

All of the above financial covenants shall be computed and determined in accordance with GAAP applied on a consistent basis (subject to normal year-end adjustments).

**Form 7G - Multistate Rev. 9/12**

Exhibit C

# Security Agreement

 **PNC**

**THIS SECURITY AGREEMENT** (this "**Agreement**"), dated as of this *3rd* day of December, 2012, is made by **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Grantor**"), with an address at 102 South Robinson Street, Perrinton, Michigan 48871, in favor of **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at 2322 Tittabawassee Road, Saginaw, Michigan 48604.

Under the terms hereof, the Bank desires to obtain and the Grantor desires to grant the Bank security for all of the Obligations (as hereinafter defined).

**NOW, THEREFORE,** the Grantor and the Bank, intending to be legally bound, hereby agree as follows:

1. <u>**Definitions.**</u>

(a) "**Collateral**" shall include all personal property of the Grantor, including the following, all whether now owned or hereafter acquired or arising and wherever located: (i) accounts (including health-care-insurance receivables and credit card receivables); (ii) securities entitlements, securities accounts, commodity accounts, commodity contracts and investment property; (iii) deposit accounts; (iv) instruments (including promissory notes); (v) documents (including warehouse receipts); (vi) chattel paper (including electronic chattel paper and tangible chattel paper); (vii) inventory, including raw materials, work in process, or materials used or consumed in Grantor's business, items held for sale or lease or furnished or to be furnished under contracts of service, sale or lease, goods that are returned, reclaimed or repossessed; (viii) goods of every nature, including stock-in-trade, goods on consignment, standing timber that is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, crops grown, growing, or to be grown, manufactured homes, computer programs embedded in such goods and farm products; (ix) equipment, including machinery, vehicles and furniture; (x) fixtures; (xi) agricultural liens; (xii) as-extracted collateral; (xiii) commercial tort claims, if any, described on Exhibit "A" hereto; (xiv) letter of credit rights; (xv) general intangibles, of every kind and description, including payment intangibles, software, computer information, source codes, object codes, records and data, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, blueprints, drawings, designs and plans, trade secrets, contracts, licenses, license agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (xvi) all supporting obligations of all of the foregoing property; (xvii) all property of the Grantor now or hereafter in the Bank's possession or in transit to or from, or under the custody or control of, the Bank or any affiliate thereof; (xviii) all cash and cash equivalents thereof; and (xix) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof. The Collateral shall also include any and all other tangible or intangible property that is described as being part of the Collateral pursuant to one or more Riders to Security Agreement that may be attached hereto or delivered in connection herewith, including the Rider to Security Agreement - Copyrights, the Rider to Security Agreement - Patents, the Rider to Security Agreement - Trademarks and the Rider to Security Agreement - Cash Collateral Account.

(b) "**Obligations**" shall include all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Grantor to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Grantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i)

**Form 10A - Multistate  Rev. 1/11**

evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements; and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of the Bank incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses.

(c)     **"UCC"** means the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the State whose law governs pursuant to the Section of this Agreement entitled "Governing Law and Jurisdiction." Terms used herein which are defined in the UCC and not otherwise defined herein shall have the respective meanings ascribed to such terms in the UCC. To the extent the definition of any category or type of collateral is modified by any amendment, modification or revision to the UCC, such modified definition will apply automatically as of the date of such amendment, modification or revision.

**2.     Grant of Security Interest.**  To secure the Obligations, the Grantor, as debtor, hereby assigns and grants to the Bank, as secured party, a continuing lien on and security interest in the Collateral.

**3.     Change in Name or Locations.**  The Grantor hereby agrees that if the location of the Collateral changes from the locations listed on Exhibit "A" hereto and made part hereof, or if the Grantor changes its name, its type of organization, its state of organization (if Grantor is a registered organization), its principal residence (if Grantor is an individual), its chief executive office (if Grantor is a general partnership or non-registered organization) or establishes a name in which it may do business that is not listed as a tradename on Exhibit "A" hereto, the Grantor will immediately notify the Bank in writing of the additions or changes.

**4.     Representations and Warranties.**  The Grantor represents, warrants and covenants to the Bank that: (a) all information, including its type of organization, jurisdiction of organization, chief executive office, and (for individuals only) principal residence are as set forth on Exhibit "A" hereto and are true and correct on the date hereof; (b) the Grantor has good, marketable and indefeasible title to the Collateral, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of the Bank created by this Agreement; (c) except as herein provided, the Grantor will not hereafter without the Bank's prior written consent sell, pledge, encumber, assign or otherwise dispose of any of the Collateral or permit any right of setoff, lien or security interest to exist thereon except to the Bank; (d) the Grantor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein; (e) each account and general intangible, if included in the definition of Collateral, is genuine and enforceable in accordance with its terms and the Grantor will defend the same against all claims, demands, setoffs and counterclaims at any time asserted; and (f) at the time any account or general intangible becomes subject to this Agreement, such account or general intangible will be a good and valid account representing a bona fide sale of goods or services by the Grantor and such goods will have been shipped to the respective account debtors or the services will have been performed for the respective account debtors, and no such account or general intangible will be subject to any claim for credit, allowance or adjustment by any account debtor or any setoff, defense or counterclaim.

Form 10A - Multistate  Rev. 1/11

5.    **Grantor's Covenants.** The Grantor covenants that it shall:

(a)    from time to time and at all reasonable times allow the Bank, by or through any of its officers, agents, attorneys, or accountants, to examine or inspect the Collateral, and obtain valuations and audits of the Collateral, at the Grantor's expense, wherever located. The Grantor shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as the Bank may require to vest in and assure to the Bank its rights hereunder and in or to the Collateral, and the proceeds thereof, including waivers from landlords, warehousemen and mortgagees. The Grantor agrees that the Bank has the right to notify (on invoices or otherwise) account debtors and other obligors or payors on any Collateral of its assignment to the Bank, and that all payments thereon should be made directly to the Bank, and that the Bank has full power and authority to collect, compromise, endorse, sell or otherwise deal with the Collateral in its own name or that of the Grantor at any time upon an Event of Default;

(b)    keep the Collateral in good order and repair at all times and immediately notify the Bank of any event causing a material loss or decline in value of the Collateral, whether or not covered by insurance, and the amount of such loss or depreciation;

(c)    only use or permit the Collateral to be used in accordance with all applicable federal, state, county and municipal laws and regulations; and

(d)    have and maintain insurance at all times with respect to all Collateral against risks of fire (including so-called extended coverage), theft, sprinkler leakage, and other risks (including risk of flood if any Collateral is maintained at a location in a flood hazard zone) as the Bank may require, in such form, in such amount, for such period and written by such companies as may be satisfactory to the Bank in its sole discretion. Each such casualty insurance policy shall contain a standard Lender's Loss Payable Clause issued in favor of the Bank under which all losses thereunder shall be paid to the Bank as the Bank's interests may appear. Such policies shall expressly provide that the requisite insurance cannot be altered or canceled without at least thirty (30) days prior written notice to the Bank and shall insure the Bank notwithstanding the act or neglect of the Grantor. Upon the Bank's demand, the Grantor shall furnish the Bank with duplicate original policies of insurance or such other evidence of insurance as the Bank may require. In the event of failure to provide insurance as herein provided, the Bank may, at its option, obtain such insurance and the Grantor shall pay to the Bank, on demand, the cost thereof. Proceeds of insurance may be applied by the Bank to reduce the Obligations or to repair or replace Collateral, all in the Bank's sole discretion.

6.    **Negative Pledge; No Transfer.** The Grantor will not sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien or security interest upon the Collateral (except for sales of inventory and collections of accounts in the Grantor's ordinary course of business), will not allow any third party to gain control of all or any part of the Collateral, and will not use any portion thereof in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.

7.    **Covenants for Accounts.** If accounts are included in the definition of Collateral:

(a)    The Grantor will, on the Bank's demand, make notations on its books and records showing the Bank's security interest and make available to the Bank shipping and delivery receipts evidencing the shipment of the goods that gave rise to an account, completion certificates or other proof of the satisfactory performance of services that gave rise to an account, a copy of the invoice for each account and copies of any written contract or order from which an account arose. The Grantor shall promptly notify the Bank if an account becomes evidenced or secured by an instrument or chattel paper and upon the Bank's request, will promptly deliver any such instrument or chattel paper to the Bank, including any letter of credit delivered to the Grantor to support a shipment of inventory by the Grantor.

(b)    The Grantor will promptly advise the Bank whenever an account debtor refuses to retain or returns any goods from the sale of which an account arose and will comply with any instructions that the Bank

- 3 -

may give regarding the sale or other disposition of such returns. From time to time with such frequency as the Bank may request, the Grantor will report to the Bank all credits given to account debtors on all accounts.

(c)     The Grantor will immediately notify the Bank if any account arises out of contracts with the United States or any department, agency or instrumentality thereof, and will execute any instruments and take any steps required by the Bank so that all monies due and to become due under such contract shall be assigned to the Bank and notice of the assignment given to and acknowledged by the appropriate government agency or authority under the Federal Assignment of Claims Act.

(d)     At any time after the occurrence of an Event of Default, and without notice to the Grantor, the Bank may direct any persons who are indebted to the Grantor on any Collateral consisting of accounts or general intangibles to make payment directly to the Bank of the amounts due. The Bank is authorized to collect, compromise, endorse and sell any such Collateral in its own name or in the Grantor's name and to give receipts to such account debtors for any such payments and the account debtors will be protected in making such payments to the Bank. Upon the Bank's written request, the Grantor will establish with the Bank and maintain a lockbox account (**"Lockbox"**) with the Bank and a depository account(s) (**"Cash Collateral Account"**) with the Bank subject to the provisions of this subparagraph and such other related agreements as the Bank may require, and the Grantor shall notify its account debtors to remit payments directly to the Lockbox. Thereafter, funds collected in the Lockbox shall be transferred to the Cash Collateral Account, and funds in the Cash Collateral Account shall be applied by the Bank, daily, to reduce the outstanding Obligations.

**8.     Further Assurances.** By its signature hereon, the Grantor hereby irrevocably authorizes the Bank to execute (on behalf of the Grantor) and file against the Grantor one or more financing, continuation or amendment statements pursuant to the UCC in form satisfactory to the Bank, and the Grantor will pay the cost of preparing and filing the same in all jurisdictions in which such filing is deemed by the Bank to be necessary or desirable in order to perfect, preserve and protect its security interests. If required by the Bank, the Grantor will execute all documentation necessary for the Bank to obtain and maintain perfection of its security interests in the Collateral. At the Bank's request, the Grantor will execute, in form satisfactory to the Bank, a Rider to Security Agreement - Copyrights (if any Collateral consists of registered or unregistered copyrights), a Rider to Security Agreement - Patents (if any Collateral consists of patents or patent applications), a Rider to Security Agreement - Trademarks (if any Collateral consists of trademarks, tradenames, tradestyles or trademark applications). If any Collateral consists of letter of credit rights, electronic chattel paper, deposit accounts or supporting obligations not maintained with the Bank or one of its affiliates, or any securities entitlement, securities account, commodities account, commodities contract or other investment property, then at the Bank's request the Grantor will execute, and will cause the depository institution or securities intermediary upon whose books and records the ownership interest of the Grantor in such Collateral appears, to execute such Pledge Agreements, Notification and Control Agreements or other agreements as the Bank deems necessary in order to perfect, prioritize and protect its security interest in such Collateral, in each case in a form satisfactory to the Bank.

**9.     Events of Default.** The Grantor shall, at the Bank's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an **"Event of Default"**): (a) any Event of Default (as defined in any of the Obligations); (b) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; (c) demand by the Bank under any of the Obligations that have a demand feature; (d) the failure by the Grantor to perform any of its obligations under this Agreement; (e) falsity, inaccuracy or material breach by the Grantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Grantor; (f) an uninsured material loss, theft, damage, or destruction to any of the Collateral, or the entry of any judgment against the Grantor or any lien against or the making of any levy, seizure or attachment of or on the Collateral; (g) the failure of the Bank to have a perfected first priority security interest in the Collateral; (h) any indication or evidence received by the Bank that the Grantor may have directly or indirectly been engaged in any type of activity which, in the Bank's discretion, might result in the forfeiture of any property of the Grantor to any governmental entity, federal, state or local; or (i) if the Bank otherwise deems itself insecure.

**Form 10A - Multistate  Rev. 1/11**

**10.**     **Remedies.**  Upon the occurrence of any such Event of Default and at any time thereafter, the Bank may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC. The Bank's remedies include, but are not limited to, the right to (a) peaceably by its own means or with judicial assistance enter the Grantor's premises and take possession of the Collateral without prior notice to the Grantor or the opportunity for a hearing, (b) render the Collateral unusable, (c) dispose of the Collateral on the Grantor's premises, (d) require the Grantor to assemble the Collateral and make it available to the Bank at a place designated by the Bank, and (e) notify the United States Postal Service to send the Grantor's mail to the Bank. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Bank will give the Grantor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made.  The requirements of commercially reasonable notice shall be met if such notice is sent to the Grantor at least ten (10) days before the time of the intended sale or disposition.  Expenses of retaking, holding, preparing for disposition, disposing or the like shall include the Bank's reasonable attorneys' fees and legal expenses, incurred or expended by the Bank to enforce any payment due it under this Agreement either as against the Grantor, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder.  The Grantor waives all relief from all appraisement or exemption laws now in force or hereafter enacted.

**11.**     **Power of Attorney.**  The Grantor does hereby make, constitute and appoint any officer or agent of the Bank as the Grantor's true and lawful attorney-in-fact, with power to (a) endorse the name of the Grantor or any of the Grantor's officers or agents upon any notes, checks, drafts, money orders, or other instruments of payment or Collateral that may come into the Bank's possession in full or part payment of any Obligations; (b) sue for, compromise, settle and release all claims and disputes with respect to, the Collateral; and (c) sign, for the Grantor, such documentation required by the UCC, or supplemental intellectual property security agreements; granting to the Grantor's said attorney full power to do any and all things necessary to be done in and about the premises as fully and effectually as the Grantor might or could do.  The Grantor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest, and is irrevocable.

**12.**     **Payment of Expenses.**  At its option, the Bank may discharge taxes, liens, security interests or such other encumbrances as may attach to the Collateral, may pay for required insurance on the Collateral and may pay for the maintenance, appraisal or reappraisal, and preservation of the Collateral, as determined by the Bank to be necessary.  The Grantor will reimburse the Bank on demand for any payment so made or any expense incurred by the Bank pursuant to the foregoing authorization, and the Collateral also will secure any advances or payments so made or expenses so incurred by the Bank.

**13.**     **Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder (**"Notices"**) must be in writing and will be effective upon receipt.  Notices  may be given in any manner to which the parties may separately agree, including electronic mail.  Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this section.

**14.**     **Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.

**Form 10A - Multistate  Rev. 1/11**

**15.    Illegality.** If any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Agreement.

**16.    Changes in Writing.** No modification, amendment or waiver of, or consent to any departure by the Grantor from, any provision of this Agreement will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Grantor will entitle the Grantor to any other or further notice or demand in the same, similar or other circumstance.

**17.    Entire Agreement.** This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**18.    Counterparts.** This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

**19.    Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of the Grantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Grantor may not assign this Agreement in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Agreement in whole or in part.

**20.    Interpretation.** In this Agreement, unless the Bank and the Grantor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Unless otherwise specified in this Agreement, all accounting terms shall be interpreted and all accounting determinations shall be made in accordance with GAAP. If this Agreement is executed by more than one Grantor, the obligations of such persons or entities will be joint and several.

**21.    Indemnity.** The Grantor agrees to indemnify each of the Bank, each legal entity, if any, who controls the Bank and each of their respective directors, officers and employees (the **"Indemnified Parties"**) and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Grantor), in connection with or arising out of or relating to the matters referred to in this Agreement or the Obligations, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Grantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity

Form 10A - Multistate  Rev. 1/11

agreement contained in this Section shall survive the termination of this Agreement, payment of the Obligations and assignment of any rights hereunder.  The Grantor may participate at its expense in the defense of any such claim.

**22.**   **Governing Law and Jurisdiction.**  This Agreement has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located.  THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCEPT THAT THE LAWS OF THE STATE WHERE ANY COLLATERAL IS LOCATED (IF DIFFERENT FROM THE STATE WHERE SUCH OFFICE OF THE BANK IS LOCATED) SHALL GOVERN THE CREATION, PERFECTION AND FORECLOSURE OF THE LIENS CREATED HEREUNDER ON SUCH PROPERTY OR ANY INTEREST THEREIN.  The Grantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Agreement will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Grantor individually, against any security or against any property of the Grantor within any other county, state or other foreign or domestic jurisdiction.  The Bank and the Grantor agree that the venue provided above is the most convenient forum for both the Bank and the Grantor.  The Grantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

Form 10A - Multistate  Rev. 1/11

23.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE GRANTOR AND THE BANK IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.   THE GRANTOR AND THE BANK ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

**The Grantor acknowledges that it has read and understood all the provisions of this Agreement, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.**

WITNESS the due execution hereof as a document under seal, as of the date first written above.

WITNESS / ATTEST:

MID MICHIGAN FEED INGREDIENTS, L.L.C.

_Fred T. Mitchell_

Print Name:  _Fred T. Mitchell_
Title: _____
(Include title only if an officer of entity signing to the right)

By: _Waino Pihl_
(SEAL)

Waino Pihl
Managing Member

PNC BANK, NATIONAL ASSOCIATION

By: _Fred T. Mitchell_
(SEAL)

Frederick T. Mitchell, Jr.
Senior Vice President

- 8 -

Form 10A - Multistate  Rev. 1/11

**EXHIBIT "A"**
**TO SECURITY AGREEMENT**

1.   Grantor's form of organization (i.e., corporation, partnership, limited liability company):

   limited liability company

2.   Grantor's State of organization, if a registered organization (i.e., corporation, limited partnership or limited liability company):

   Michigan

3.   Grantor's principal residence, if a natural person or general partnership:


4.   Address of Grantor's chief executive office, including the County:

   102 South Robinson Street, Perrinton, Michigan 48871

5.   Grantor's EIN, if not a natural person:


6.   Grantor's SSN, if a natural person:


7.   Grantor's organizational ID# (if any exists):


8.   Address for books and records, if different:


9.   Addresses of other Collateral locations, including Counties, for the past five (5) years:


10.   Name and address of landlord or owner if location is not owned by the Grantor:


11.   Other names or tradenames now or formerly used by the Grantor:


12.   List of all existing Commercial Tort Claims (by case title with court and brief description of claim):

**Form 10A - Multistate  Rev. 1/11**

Exhibit D

# Guaranty and Suretyship Agreement



THIS GUARANTY AND SURETYSHIP AGREEMENT (this "**Guaranty**") is made and entered into as of this **3rd** day of December, 2012, by **WAINO PIHL** (the "**Guarantor**"), with an address at 5788 Wells Road, Ithaca, Michigan 48847, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at 2322 Tittabawassee Road, Saginaw, Michigan 48604, to **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

**1.**     **Guaranty of Obligations.**  The Guarantor hereby unconditionally guarantees, as a primary obligor, and becomes surety for, the prompt payment and performance of all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not  (i) evidenced by any note, guaranty or other instrument,  (ii) arising under any agreement, instrument or document,  (iii) for the payment of money,  (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, or  (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements;  and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of the Bank incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses (collectively, the "**Obligations**").  If the Borrower defaults under any such Obligations, the Guarantor will pay the amount due to the Bank.

**2.**     **Nature of Guaranty; Waivers.**  This is a guaranty of payment and not of collection and the Bank shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Borrower, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time.  This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof.  The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Borrower or the Bank, except payment or performance of the Obligations.

Notice of acceptance of this Guaranty, notice of extensions of credit to the Borrower from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon the Bank's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived. The Guarantor waives all defenses based on suretyship or impairment of collateral.

The Bank at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Borrower in such order, manner and amount as the Bank may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Borrower or the Guarantor, with respect to any Obligations in such manner as the Bank deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

**3.**    **Repayments or Recovery from the Bank.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank. The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

**4.**    **Financial Statements.**  Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

**5.**    **Enforceability of Obligations.**  No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted.  The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Borrower that may result from any such proceeding.

**6.**    **Events of Default.**  The occurrence of any of the following shall be an **"Event of Default"**: (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; (iii) demand by the Bank under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty.  Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to the Bank the amount of the Obligations; or (b) on demand of the Bank, the Guarantor shall immediately deposit with the Bank, in U.S. dollars, all amounts due or to become due under the Obligations, and the Bank may at any time use such funds to repay the Obligations; or (c) the Bank in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial Code; or

(d) the Bank in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

7. **Right of Setoff.** In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Guarantor's obligations to the Bank under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

8. **Collateral.** This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to the Bank and by such other collateral as previously may have been or may in the future be granted to the Bank to secure any Obligations of the Guarantor to the Bank.

9. **Costs.** To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

10. **Postponement of Subrogation.** Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of the Bank or its designee (and any assignee or potential assignee) any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Borrower based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Borrower, including participation in any marshalling of the Borrower's assets.

11. **Notices.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder (**"Notices"**) must be in writing and will be effective upon receipt. Notices may be given in any manner to which the Bank and the Guarantor may separately agree, including electronic mail. Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to addresses for the Bank and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

12. **Preservation of Rights.** No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power. The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity. The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

13. **Illegality.** If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

Form 9A –MI/DC/FL (NCOJ) Rev. 5/12

14. **Changes in Writing.** No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing, the Bank may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

15. **Entire Agreement.** This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and the Bank with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to the Bank.

16. **Successors and Assigns.** This Guaranty will be binding upon and inure to the benefit of the Guarantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Guaranty in whole or in part.

17. **Interpretation.** In this Guaranty, unless the Bank and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty. Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose. If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

18. **Anti-Money Laundering/International Trade Law Compliance.** The Guarantor represents and warrants to the Bank, as of the date of this Guaranty, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejections of transactions) under any order or directive of any Compliance Authority; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law or regulation enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country; and (C) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including the USA Patriot Act, the Trading with the Enemy Act, or the U.S. Foreign Corrupt Practices Act of 1977, all as amended, supplemented or replaced from time to time. As used herein: "**Compliance Authority**" means each and all of the (a) U.S. Department of the Treasury's Office of Foreign Asset Control; (b) U.S. Treasury Department/Financial Crimes Enforcement Network; (c) U.S. State Department/Directorate of Defense Trade Controls; (d) U.S. Commerce Department/Bureau of Industry and Security; (e) U.S. Internal Revenue Service; (f) U.S. Justice Department; and (g) U.S. Securities and Exchange Commission. "**Sanctioned Country**" means a country subject to a sanctions program maintained by any Compliance Authority. "**Sanctioned Person**" means any individual person, a group, regime, entity or thing subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

19. **Indemnity.** The Guarantor agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the **"Indemnified Parties"**), and to defend and hold each Indemnified Party harmless

- 4 -

from and against, any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor), in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty and assignment of any rights hereunder. The Guarantor may participate at its expense in the defense of any such claim.

20. **Governing Law and Jurisdiction.** This Guaranty has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located. THIS GUARANTY WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE GUARANTOR DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES. The Guarantor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Guaranty will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

21. **Equal Credit Opportunity Act.** If the Guarantor is not an "applicant for credit" under Section 202.2 (e) of the Equal Credit Opportunity Act of 1974 ("ECOA"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

22. **Authorization to Obtain Credit Reports**. By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Guaranty and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Form 9A –MI/DC/FL (NCOJ) Rev. 5/12

23.   **WAIVER OF JURY TRIAL.** THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Guarantor acknowledges that it has read and understood all the provisions of this Guaranty, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

WITNESS / ATTEST:

Print Name: _Fred T. Mitchell_

**WAINO PIHL**, individually

(SEAL)

Form 9A –MI/DC/FL (NCOJ)  Rev. 5/12

Exhibit E

# Guaranty and Suretyship Agreement

 **PNC**

**THIS GUARANTY AND SURETYSHIP AGREEMENT** (this "**Guaranty**") is made and entered into as of this ___8th___ day of December, 2017, by **GRATIOT AG INVESTMENTS, L.L.C.** (the "**Guarantor**"), with an address at 4584 ½ W. Garfield Road, Middleton, Michigan 48856, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at 2322 Tittabawassee Road, Saginaw, Michigan 48604, to **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1.     **Guaranteed Obligations.**

    (a)    The Guarantor hereby unconditionally guarantees, as a primary obligor, and becomes surety for (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

    (b)    Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute (the "**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading

Commission (the **"CFTC"**), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) **"Eligibility Date"** means the date on which this Guaranty becomes effective with respect to the particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) **"Swap"** means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Borrower and the Bank, other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

   **(c)**  If the Borrower defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to the Bank.

   **2.**  **Nature of Guaranty; Waivers.**  This is a guaranty of payment and performance, and not merely of collection and the Bank shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Borrower, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

   This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time.  This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof.  The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Borrower or the Bank, except payment or performance of the Obligations.

   Notice of acceptance of this Guaranty, notice of extensions of credit to the Borrower from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon the Bank's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived.  The Guarantor waives all defenses based on suretyship or impairment of collateral.

   The Bank at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Borrower in such order, manner and amount as the Bank may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Borrower or the Guarantor, with respect to any Obligations in such manner as the Bank deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

   **3.**  **Repayments or Recovery from the Bank.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank.  The provisions of this section will be and remain effective notwithstanding

**Form 9A – DC/FL/MI (NCOJ)  Rev. 4/17**

any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

**4.      Financial Statements.**  Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

**5.      Enforceability of Obligations.**  No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted.  The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Borrower that may result from any such proceeding.

**6.      Events of Default.**  The occurrence of any of the following shall be an **"Event of Default"**: (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in the Obligations with respect to such default; (iii) demand by the Bank under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty.  Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to the Bank the amount of the Guaranteed Obligations; or (b) on demand of the Bank, the Guarantor shall immediately deposit with the Bank, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and the Bank may at any time use such funds to repay the Obligations; or (c) the Bank in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial Code; or (d) the Bank in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

**7.      Right of Setoff.**  In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Guarantor's obligations to the Bank under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts.  Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor.  Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

**8.      Collateral.**  This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to the Bank and by such other collateral as previously may have been or may in the future be granted to the Bank to secure any obligations of the Guarantor to the Bank.

**9.      Costs.**  To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of

- 3 -

litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10.     Postponement of Subrogation.**  Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of the Bank or its designee (and any assignee or potential assignee) any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Borrower based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Borrower, including participation in any marshalling of the Borrower's assets.

**11.     Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as otherwise provided in this Guaranty) and will be effective upon receipt.  Notices may be given in any manner to which the Bank and the Guarantor may agree.  Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  In addition, the Bank and the Guarantor agree that Notices may be sent electronically to any electronic address provided by either to the other from time to time.  Notices may be sent to addresses for the Bank and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**12.     Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**13.     Illegality.**  If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**14.     Changes in Writing.**  No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail).  No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**15.     Entire Agreement.**  This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and the Bank with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to the Bank.

**16.     Successors and Assigns.**  This Guaranty will be binding upon and inure to the benefit of the Guarantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Guaranty in whole or in part.

**17.     Interpretation.**  In this Guaranty, unless the Bank and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed

to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty. Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose. If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

18. **Anti-Money Laundering/International Trade Law Compliance.** The Guarantor represents and warrants to the Bank, as of the date of this Guaranty, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejections of transactions) under any order or directive of any Compliance Authority; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law or regulation enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country; and (C) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including the USA Patriot Act, the Trading with the Enemy Act, or the U.S. Foreign Corrupt Practices Act of 1977, all as amended, supplemented or replaced from time to time. As used herein: **"Compliance Authority"** means each and all of the (a) U.S. Department of the Treasury's Office of Foreign Asset Control; (b) U.S. Treasury Department/Financial Crimes Enforcement Network; (c) U.S. State Department/Directorate of Defense Trade Controls; (d) U.S. Commerce Department/Bureau of Industry and Security; (e) U.S. Internal Revenue Service; (f) U.S. Justice Department; and (g) U.S. Securities and Exchange Commission. **"Sanctioned Country"** means a country subject to a sanctions program maintained by any Compliance Authority. **"Sanctioned Person"** means any individual person, a group, regime, entity or thing subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

19. **Indemnity.** The Guarantor agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the **"Indemnified Parties"**), and to defend and hold each Indemnified Party harmless from and against, any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor), in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this section shall survive the termination of this Guaranty and assignment of any rights hereunder. The Guarantor may participate at its expense in the defense of any such claim.

20. **Governing Law and Jurisdiction.** This Guaranty has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located. THIS GUARANTY WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE GUARANTOR DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN SUCH STATE (OR, TO THE EXTENT CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT). The Guarantor hereby irrevocably consents to the

Form 9A – DC/FL/MI (NCOJ) Rev. 4/17

exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Guaranty will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

      **21.**   **Electronic Signatures and Records.** Notwithstanding any other provision herein, the Guarantor agrees that this Guaranty, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a **"Communication"**) may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this section may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

      **22.**   **Limitation of Personal Liability.** Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations and the execution of this Guaranty, the spouse who is deemed not to be the applicant for purposes of such regulation shall not be personally liable under this Guaranty, provided that this provision will not limit the Bank's right to obtain such judgment, order or other relief against such individual as may be necessary for the Bank to exercise all of its rights and remedies with respect to assets held jointly as of the date of the Guarantor's most recent financial statement delivered prior to the date hereof or thereafter acquired.

      **23.**   **Equal Credit Opportunity Act.** If the Guarantor is not an "applicant for credit" under Section 202.2 (e) of the Equal Credit Opportunity Act of 1974 ("ECOA"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

      **24.**   **Authorization to Obtain Credit Reports.** By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Guaranty and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**Form 9A – DC/FL/MI (NCOJ) Rev. 4/17**

25.     <u>WAIVER OF JURY TRIAL</u>. THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Guarantor acknowledges that it has read and understood all the provisions of this Guaranty, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

WITNESS / ATTEST:                  **GRATIOT AG INVESTMENTS, L.L.C.**

_Keary A Richardson_                 By: _Waino Pihl_
                                              (SEAL)
Print Name: _Keary A Richardson_    Name:  Waino Pihl
Title:_____              Title:   Member
(Include title only if an officer of entity signing to the right)

Open.21511.73997.19430691-1

- 7 -

Form 9A – DC/FL/MI (NCOJ)  Rev. 4/17

# Guaranty and
# Suretyship Agreement

 PNC

**THIS GUARANTY AND SURETYSHIP AGREEMENT** (this "**Guaranty**") is made and entered into as of this ___8th___ day of December, 2017, by **JBT GRAIN COMPANY, L.L.C.** (the "**Guarantor**"), with an address at 4584 ½ W. Garfield Road, Middleton, Michigan 48856, in consideration of the extension of credit by **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"), with an address at 2322 Tittabawassee Road, Saginaw, Michigan 48604, to **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**"), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1. **Guaranteed Obligations.**

   (a)     The Guarantor hereby unconditionally guarantees, as a primary obligor, and becomes surety for (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations (collectively, the "**Guaranteed Obligations**"). As used herein, "**Obligations**" means all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, whether or not (i) evidenced by any note, guaranty or other instrument, (ii) arising under any agreement, instrument or document, (iii) for the payment of money, (iv) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, (v) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (vi) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (vii) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of the Bank to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements, or (viii) arising from any amendments, extensions, renewals and increases of or to any of the foregoing.

   (b)     Notwithstanding anything to the contrary contained herein, the definition of "**Obligations**" shall specifically exclude any and all Excluded Swap Obligations. The foregoing limitation of the definition of Obligations shall only be deemed applicable to the obligations of the Guarantor (or solely any particular Guarantor(s) if there is more than one Guarantor) under the particular Swap (or Swaps), or, if arising under a master agreement governing more than one Swap, the portion thereof, that constitute Excluded Swap Obligations. As used herein, (i) "**Excluded Swap Obligations**" means, with respect to each Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap if, and to the extent that, all or any portion of this Guaranty that relates to the obligations under such Swap is or becomes illegal as to such Guarantor under the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute (the "**CEA**"), or any rule, regulation, or order of the Commodity Futures Trading

Commission (the "**CFTC**"), by virtue of such Guarantor's failure for any reason to qualify as an "eligible contract participant" (as defined in the CEA and regulations promulgated thereunder) on the Eligibility Date for such Swap; (ii) "**Eligibility Date**" means the date on which this Guaranty becomes effective with respect to the particular Swap (for the avoidance of doubt, the Eligibility Date shall be the date of the execution of the particular Swap if this Guaranty is then in effect, and otherwise it shall be the date of execution and delivery of this Guaranty); and (iii) "**Swap**" means any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder between the Borrower and the Bank, other than (A) a swap entered into on, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (B) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

        (**c**)     If the Borrower defaults under any Obligations, the Guarantor will pay the Guaranteed Obligations due to the Bank.

       **2.**     **Nature of Guaranty; Waivers.**  This is a guaranty of payment and performance, and not merely of collection and the Bank shall not be required or obligated, as a condition of the Guarantor's liability, to make any demand upon or to pursue any of its rights against the Borrower, or to pursue any rights which may be available to it with respect to any other person who may be liable for the payment of the Obligations.

       This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time. This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof. The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, recoupment, deduction or defense based upon any claim the Guarantor may have (directly or indirectly) against the Borrower or the Bank, except payment or performance of the Obligations.

       Notice of acceptance of this Guaranty, notice of extensions of credit to the Borrower from time to time, notice of default, diligence, presentment, notice of dishonor, protest, demand for payment, and any defense based upon the Bank's failure to comply with the notice requirements under Sections 9-611 and 9-612 of the Uniform Commercial Code as in effect from time to time are hereby waived. The Guarantor waives all defenses based on suretyship or impairment of collateral.

       The Bank at any time and from time to time, without notice to or the consent of the Guarantor, and without impairing or releasing, discharging or modifying the Guarantor's liabilities hereunder, may (a) change the manner, place, time or terms of payment or performance of or interest rates on, or other terms relating to, any of the Obligations; (b) renew, substitute, modify, amend or alter, or grant consents or waivers relating to any of the Obligations, any other guaranties, or any security for any Obligations or guaranties; (c) apply any and all payments by whomever paid or however realized including any proceeds of any collateral, to any Obligations of the Borrower in such order, manner and amount as the Bank may determine in its sole discretion; (d) settle, compromise or deal with any other person, including the Borrower or the Guarantor, with respect to any Obligations in such manner as the Bank deems appropriate in its sole discretion; (e) substitute, exchange or release any security or guaranty; or (f) take such actions and exercise such remedies hereunder as provided herein.

       **3.**     **Repayments or Recovery from the Bank.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank. The provisions of this section will be and remain effective notwithstanding

**Form 9A – DC/FL/MI (NCOJ) Rev. 4/17**

any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

      **4.**     **Financial Statements.** Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

      **5.**     **Enforceability of Obligations.** No modification, limitation or discharge of the Obligations arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law will affect, modify, limit or discharge the Guarantor's liability in any manner whatsoever and this Guaranty will remain and continue in full force and effect and will be enforceable against the Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted. The Guarantor waives all rights and benefits which might accrue to it by reason of any such proceeding and will be liable to the full extent hereunder, irrespective of any modification, limitation or discharge of the liability of the Borrower that may result from any such proceeding.

      **6.**     **Events of Default.** The occurrence of any of the following shall be an **"Event of Default"**: (i) any Event of Default (as defined in any of the Obligations); (ii) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in the Obligations with respect to such default; (iii) demand by the Bank under any of the Obligations that have a demand feature; (iv) the Guarantor's failure to perform any of its obligations hereunder; (v) the falsity, inaccuracy or material breach by the Guarantor of any written warranty, representation or statement made or furnished to the Bank by or on behalf of the Guarantor; or (vi) the termination or attempted termination of this Guaranty. Upon the occurrence of any Event of Default, (a) the Guarantor shall pay to the Bank the amount of the Guaranteed Obligations; or (b) on demand of the Bank, the Guarantor shall immediately deposit with the Bank, in U.S. dollars, all amounts due or to become due under the Guaranteed Obligations, and the Bank may at any time use such funds to repay the Obligations; or (c) the Bank in its discretion may exercise with respect to any collateral any one or more of the rights and remedies provided a secured party under the applicable version of the Uniform Commercial Code; or (d) the Bank in its discretion may exercise from time to time any other rights and remedies available to it at law, in equity or otherwise.

      **7.**     **Right of Setoff.** In addition to all liens upon and rights of setoff against the Guarantor's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Guarantor's obligations to the Bank under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Guarantor hereby grants Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Guarantor's right, title and interest in and to, all of the Guarantor's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Guarantor. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

      **8.**     **Collateral.** This Guaranty is secured by the property described in any collateral security documents which the Guarantor executes and delivers to the Bank and by such other collateral as previously may have been or may in the future be granted to the Bank to secure any obligations of the Guarantor to the Bank.

      **9.**     **Costs.** To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of

Form 9A – DC/FL/MI (NCOJ)  Rev. 4/17

litigation, such costs and expenses will be due on demand, will be included in the Guaranteed Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

**10.    Postponement of Subrogation.**  Until the Obligations are indefeasibly paid in full, expire, are terminated and are not subject to any right of revocation or rescission, the Guarantor postpones and subordinates in favor of the Bank or its designee (and any assignee or potential assignee) any and all rights which the Guarantor may have to (a) assert any claim whatsoever against the Borrower based on subrogation, exoneration, reimbursement, or indemnity or any right of recourse to security for the Obligations with respect to payments made hereunder, and (b) any realization on any property of the Borrower, including participation in any marshalling of the Borrower's assets.

**11.    Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as otherwise provided in this Guaranty) and will be effective upon receipt.  Notices may be given in any manner to which the Bank and the Guarantor may agree. Without limiting the foregoing, first-class mail, postage prepaid, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices.  In addition, the Bank and the Guarantor agree that Notices may be sent electronically to any electronic address provided by either to the other from time to time.  Notices may be sent to addresses for the Bank and the Guarantor as set forth above or to such other address as either may give to the other for such purpose in accordance with this section.

**12.    Preservation of Rights.**  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or any collateral securing, the Obligations.

**13.    Illegality.**  If any provision contained in this Guaranty should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Guaranty.

**14.    Changes in Writing.**  No modification, amendment or waiver of, or consent to any departure by the Guarantor from, any provision of this Guaranty will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Notwithstanding the foregoing, the Bank may modify this Guaranty for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Guarantor (which notice may be given by electronic mail). No notice to or demand on the Guarantor will entitle the Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**15.    Entire Agreement.**  This Guaranty (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Guarantor and the Bank with respect to the subject matter hereof; provided, however, that this Guaranty is in addition to, and not in substitution for, any other guarantees from the Guarantor to the Bank.

**16.    Successors and Assigns.**  This Guaranty will be binding upon and inure to the benefit of the Guarantor and the Bank and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Guarantor may not assign this Guaranty in whole or in part without the Bank's prior written consent and the Bank at any time may assign this Guaranty in whole or in part.

**17.    Interpretation.**  In this Guaranty, unless the Bank and the Guarantor otherwise agree in writing, the singular includes the plural and the plural the singular; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed

**Form 9A – DC/FL/MI (NCOJ)  Rev. 4/17**

to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and references to sections or exhibits are to those of this Guaranty. Section headings in this Guaranty are included for convenience of reference only and shall not constitute a part of this Guaranty for any other purpose. If this Guaranty is executed by more than one party as Guarantor, the obligations of such persons or entities will be joint and several.

18. **Anti-Money Laundering/International Trade Law Compliance.** The Guarantor represents and warrants to the Bank, as of the date of this Guaranty, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any loan, and at all times any Obligations exist that: (A) no Guarantor (i) is listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejections of transactions) under any order or directive of any Compliance Authority; (ii) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person; or (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Person or Sanctioned Country in violation of any law or regulation enforced by any Compliance Authority; (B) the proceeds of any loan will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country; and (C) each Guarantor is in compliance with, and no Guarantor engages in any dealings or transactions prohibited by, any laws of the United States including the USA Patriot Act, the Trading with the Enemy Act, or the U.S. Foreign Corrupt Practices Act of 1977, all as amended, supplemented or replaced from time to time. As used herein: **"Compliance Authority"** means each and all of the (a) U.S. Department of the Treasury's Office of Foreign Asset Control; (b) U.S. Treasury Department/Financial Crimes Enforcement Network; (c) U.S. State Department/Directorate of Defense Trade Controls; (d) U.S. Commerce Department/Bureau of Industry and Security; (e) U.S. Internal Revenue Service; (f) U.S. Justice Department; and (g) U.S. Securities and Exchange Commission. **"Sanctioned Country"** means a country subject to a sanctions program maintained by any Compliance Authority. **"Sanctioned Person"** means any individual person, a group, regime, entity or thing subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

19. **Indemnity.** The Guarantor agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the **"Indemnified Parties"**), and to defend and hold each Indemnified Party harmless from and against, any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Guarantor), in connection with or arising out of or relating to the matters referred to in this Guaranty, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Guarantor, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this section shall survive the termination of this Guaranty and assignment of any rights hereunder. The Guarantor may participate at its expense in the defense of any such claim.

20. **Governing Law and Jurisdiction.** This Guaranty has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated above is located. THIS GUARANTY WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE GUARANTOR DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE WHERE THE BANK'S OFFICE INDICATED ABOVE IS LOCATED, EXCLUDING ITS CONFLICT OF LAWS RULES, INCLUDING WITHOUT LIMITATION THE ELECTRONIC TRANSACTIONS ACT (OR EQUIVALENT) IN SUCH STATE (OR, TO THE EXTENT CONTROLLING, THE LAWS OF THE UNITED STATES OF AMERICA, INCLUDING WITHOUT LIMITATION THE ELECTRONIC SIGNATURES IN GLOBAL AND NATIONAL COMMERCE ACT). The Guarantor hereby irrevocably consents to the

exclusive jurisdiction of any state or federal court in the county or judicial district where the Bank's office indicated above is located; provided that nothing contained in this Guaranty will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Guarantor individually, against any security or against any property of the Guarantor within any other county, state or other foreign or domestic jurisdiction. The Guarantor acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Guarantor. The Guarantor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Guaranty.

21.   **Electronic Signatures and Records**.  Notwithstanding any other provision herein, the Guarantor agrees that this Guaranty, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a **"Communication"**) may, at the Bank's option, be in the form of an electronic record.   Any Communication may, at the Bank's option, be signed or executed using electronic signatures.  For the avoidance of doubt, the authorization under this section may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

22.   **Limitation of Personal Liability**.  Notwithstanding anything contained herein to the contrary, it is agreed that, unless an exception to the requirements of Regulation B of the Board of Governors of the Federal Reserve System applies in connection with the extension of the Obligations and the execution of this Guaranty, the spouse who is deemed not to be the applicant for purposes of such regulation shall not be personally liable under this Guaranty, provided that this provision will not limit the Bank's right to obtain such judgment, order or other relief against such individual as may be necessary for the Bank to exercise all of its rights and remedies with respect to assets held jointly as of the date of the Guarantor's most recent financial statement delivered prior to the date hereof or thereafter acquired.

23.   **Equal Credit Opportunity Act**.  If the Guarantor is not an "applicant for credit" under Section 202.2 (e) of the Equal Credit Opportunity Act of 1974 ("ECOA"), the Guarantor acknowledges that (i) this Guaranty has been executed to provide credit support for the Obligations, and (ii) the Guarantor was not required to execute this Guaranty in violation of Section 202.7(d) of the ECOA.

24.   **Authorization to Obtain Credit Reports**.  By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee) to obtain the Guarantor's personal credit profile from one or more national credit bureaus.  Such authorization shall extend to obtaining a credit profile in considering this Guaranty and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Form 9A – DC/FL/MI (NCOJ)  Rev. 4/17

25.   WAIVER OF JURY TRIAL. THE GUARANTOR IRREVOCABLY WAIVES ANY AND ALL RIGHT THE GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS GUARANTY, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS GUARANTY OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Guarantor acknowledges that it has read and understood all the provisions of this Guaranty, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

WITNESS / ATTEST:                    **JBT GRAIN COMPANY, L.L.C.**


_Keary A Richardson_           By: _Waino Pihl_
                                                    (SEAL)
Print Name: _Keary A. Richardson_   Name:  Waino Pihl
Title: _____       Title:  Member
(Include title only if an officer of entity signing to the right)


Open.21511.73997.19430845-1

- 7 -

Exhibit F

# First Amendment to Loan Documents



**THIS FIRST AMENDMENT TO LOAN DOCUMENTS** (this **"Amendment"**) is made as of January _16_, 2013, by and between **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the **"Borrower"**), and **PNC BANK, NATIONAL ASSOCIATION** (the **"Bank"**).

## BACKGROUND

A.     The Borrower has executed and delivered to the Bank (or a predecessor which is now known by the Bank's name as set forth above), one or more promissory notes, letter agreements, loan agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made a part of this Amendment (collectively as amended from time to time, the **"Loan Documents"**) which evidence or secure some or all of the Borrower's obligations to the Bank for one or more loans or other extensions of credit (the **"Obligations"**).

B.     The Borrower and the Bank desire to amend the Loan Documents as provided for in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

1.     Certain of the Loan Documents are amended as set forth in Exhibit A.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

2.     The Borrower hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment, (ii) ratified and confirmed without condition as if made anew, and (iii) incorporated into this Amendment by reference, (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document which will not be cured by the execution and effectiveness of this Amendment, (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained, and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms.  The Borrower confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

3.     The Borrower hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Borrower or third parties (if applicable), shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's existing and future Obligations to the Bank, as modified by this Amendment.

4.     As a condition precedent to the effectiveness of this Amendment, the Borrower shall comply with the terms and conditions (if any) specified in Exhibit A.

5.      To induce the Bank to enter into this Amendment, the Borrower waives and releases and forever discharges the Bank and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that it may have against the Bank or any of them arising out of or relating to the Obligations.  The Borrower further agrees to indemnify and hold the Bank and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Bank or any of them on account of any claims arising out of or relating to the Obligations.  The Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.   Delivery of an executed counterpart of a signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually executed counterpart.  Any party so executing this Amendment by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

7.      The Bank may modify this Amendment for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).

8.      This Amendment will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns.

9.      This Amendment has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated in the Loan Documents is located.  This Amendment will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State where the Bank's office indicated in the Loan Documents is located, excluding its conflict of laws rules.

# REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**Form 17A – Multistate  Rev. 9/12**

10.     Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Bank's rights and remedies (all of which are hereby reserved).  **The Borrower expressly ratifies and confirms the confession of judgment (if applicable) and waiver of jury trial provisions contained in the Loan Documents.**

**WITNESS** the due execution of this Amendment as a document under seal as of the date first written above.

WITNESS / ATTEST:

**MID MICHIGAN FEED INGREDIENTS, L.L.C.**

Print Name: _Fred T. Mitchell_
Title:_____
(Include title only if an officer of entity signing to the right)

By: _Waino Pihl_ (SEAL)

Waino Pihl
Member

**PNC BANK, NATIONAL ASSOCIATION**

By: _Fredk T. Mitchell_ (SEAL)

Frederick T. Mitchell, Jr.
Senior Vice President

- 3 -

Form 17A – Multistate  Rev. 9/12

**EXHIBIT A TO**
**FIRST AMENDMENT TO LOAN DOCUMENTS**
**DATED AS OF JANUARY 16, 2013**

A.   The "Loan Documents" that are the subject of this Amendment include the following (as any of the foregoing have previously been amended, modified or otherwise supplemented):

1.   $4,000,000.00 Committed Line of Credit Note dated December 3, 2012, executed and delivered to the Bank by the Borrower

2.   Working Cash®, Line of Credit, Investment Sweep Rider, dated as of December 3, 2012, between the Borrower and the Bank

3.   Loan Agreement dated December 3, 2012 between the Borrower and the Bank

4.   Borrowing Base Rider, dated as of December 3, 2012, between the Borrower and the Bank (the "**Borrowing Base Rider**")

5.   Security Agreement dated December 3, 2012 between the Borrower and the Bank

6.   Guaranty and Suretyship Agreements each dated December 3, 2012, executed and delivered to the Bank by each of:

   (a)   Kim Duflo;
   (b)   Kelvin Duflo;
   (c)   Waino Pihl; and
   (d)   Kris D. Duflo

7.   All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.


B.   The Loan Documents are amended as follows:

1.   The Borrowing Base Rider is amended as follows:

   (a)   Section 3 (n) of the Borrowing Base Rider is hereby amended and restated to read in its entirety as follows:

      "(n)   The Account has not been outstanding for more than sixty (60) days past the invoice date and is not subject to "dating" terms;"

   (b)   Section 3 (o) of the Borrowing Base Rider is hereby amended and restated to read in its entirety as follows:

      "(o)   The Account shall be ineligible if 50% or more of the accounts of the related Account Debtor and its Affiliates remain unpaid for more than sixty (60) days after the date of original invoice therefor;"

-4-

C.   Conditions to Effectiveness of Amendment: The Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions:

    1.   Execution by all parties and delivery to the Bank of this Amendment, including the attached Consent.

**Form 17A – Multistate  Rev. 9/12**

# CONSENT OF GUARANTOR

Each of the undersigned guarantors (jointly and severally if more than one, the "**Guarantor**") consents to the provisions of the foregoing Amendment (the "**Amendment**") and all prior amendments (if any) and confirms and agrees that: (a) the Guarantor's obligations under its respective Guaranty and Suretyship Agreement dated December 3, 2012 (collectively if more than one, the "**Guaranty**"), relating to the Obligations mentioned in the Amendment, shall be unimpaired by the Amendment; (b) the Guarantor has no defenses, set offs, counterclaims, discounts or charges of any kind against the Bank, its officers, directors, employees, agents or attorneys with respect to the Guaranty; and (c) all of the terms, conditions and covenants in the Guaranty remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guaranty are true and correct.

The Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Guarantor or third parties (if applicable), shall continue unimpaired and in full force and effect, shall cover and secure all of the Guarantor's existing and future Obligations to the Bank, as modified by this Amendment.

By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, each such Guarantor affirms his/her identity as the respective individual(s) identified in the Guaranty.

**The Guarantor ratifies and confirms the indemnification, confession of judgment (if applicable) and waiver of jury trial provisions contained in the Guaranty.**

**WITNESS** the due execution of this Consent as a document under seal as of the date of this Amendment, intending to be legally bound hereby.

WITNESS / ATTEST:

Print Name: _Kim Duflo_     **KIM DUFLO**, individually   (SEAL)

Print Name: _Kelvin Duflo_     **KELVIN DUFLO**, individually   (SEAL)

Print Name: _Fred T. Mitchell_     **WAINO PIHL**, individually   (SEAL)

Print Name: _Fred T. Mitchell_     **KRIS D. DUFLO**, individually   (SEAL)

- 6 -

Form 17A – Multistate  Rev. 9/12



# Waiver and Amendment to Loan Documents   <span>&#9680;PNC</span>

THIS WAIVER AND AMENDMENT TO LOAN DOCUMENTS (this "Amendment") is made as of November 27, 2012, by and between MID MICHIGAN FEED INGREDIENTS, L.L.C. (the "Borrower"), and PNC BANK, NATIONAL ASSOCIATION (the "Bank").

## BACKGROUND

A. The Borrower has executed and delivered to the Bank (or a predecessor which is now known by the Bank's name as set forth above), one or more promissory notes, letter agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made a part of this Amendment (collectively as amended from time to time, the "Loan Documents") which evidence or secure some or all of the Borrower's obligations to the Bank for one or more loans or other extensions of credit (the "Obligations").

B. The Borrower and the Bank desire to amend the Loan Documents, and to waive certain defaults thereunder, as provided for in this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

1. Certain of the Loan Documents are amended, and certain defaults under the Loan Documents are waived, as set forth in Exhibit A. Any and all references to any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment. This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents. To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

2. The Borrower hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment, (ii) ratified and confirmed without condition, (iii) incorporated into this Amendment by reference, (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document which will not be cured by the execution and effectiveness of this Amendment, (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained, and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

3. The Borrower hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Borrower or third parties (if applicable), shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's existing and future Obligations to the Bank, as modified by this Amendment.

4. As a condition precedent to the effectiveness of this Amendment, the Borrower shall comply with the terms and conditions (if any) specified in Exhibit A.

5. To induce the Bank to enter into this Amendment, the Borrower waives and releases and forever discharges the Bank and its officers, directors, employees from any liability, damage, claim, loss or expense of any kind that it may have against the Bank or any of them arising out of or relating to the Obligations. The Borrower further agrees to indemnify and hold the Bank and its officers, directors, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Bank or any of them on account of any claims arising out of or relating to the Obligations. The Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6. This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Amendment by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

7. The Bank may modify this Amendment for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).

8. This Amendment will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns.

9. This Amendment has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated in the Loan Documents is located. This Amendment will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State where the Bank's office indicated in the Loan Documents is located, excluding its conflict of laws rules.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

-2-

10.    Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed. Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Documents, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Bank's rights and remedies (all of which are hereby reserved). The Borrower expressly ratifies and confirms the confession of judgment (if applicable) and waiver of jury trial provisions contained in the Loan Documents.

WITNESS the due execution of this Amendment as a document under seal as of the date first written above.

WITNESS / ATTEST:

MID-MICHIGAN FEED INGREDIENTS, LLC.

By: _____ (SEAL)
Waino Pihl
Member

Print Name: Deborah Andrews
Title: Accountant
(indicate title only if an officer or entity signing as to right)

PNC BANK, NATIONAL ASSOCIATION

By: _____ (SEAL)
Frederick T. Mitchell, Jr.
Senior Vice President

-3-

EXHIBIT A TO
WAIVER AND AMENDMENT TO LOAN DOCUMENTS
DATED AS OF NOVEMBER 27, 2013

A.    The "Loan Documents" that are the subject of this Amendment include the following (as any of the foregoing have previously been amended, modified or otherwise supplemented):

1.    $4,000,000.00 Committed Line of Credit Note dated December 3, 2012, executed and delivered to the Bank by the Borrower (the "Existing Note")

2.    Working Capital, Line of Credit, Investment Swap Rider, dated as of December 3, 2012, between the Borrower and the Bank

3.    Loan Agreement dated December 3, 2012 between the Borrower and the Bank (the "Loan Agreement")

4.    Borrowing Base Rider, dated as of December 3, 2012 between the Borrower and the Bank (the "Borrowing Base Rider")

5.    Security Agreement dated December 3, 2012 between the Borrower and the Bank

6.    Guaranty and Suretyship Agreements each dated December 3, 2012, executed and delivered to the Bank by each of:
    (a)    Kim Duflo;
    (b)    Kevin Duflo;
    (c)    Waino Pihl; and
    (d)    Ken D. Duflo

7.    First Amendment to Loan Documents dated January 16, 2013 between the Borrower and the Bank

8.    All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.    The Loan Documents are amended as follows:

1.    Waiver. The Borrower has acknowledged and agreed with the Bank that the Borrower failed to comply with (i) the Tangible Net Worth covenant for the periods ending December 31, 2012, March 31, 2013, June 30, 2013 and September 30, 2013, (ii) Section 4.2 of the Loan Agreement "Certificate of No Default" for the period ending December 31, 2012, March 31, 2013, June 30, 2013 and September 30, 2013, (iii) Section 4.3 of the Loan Agreement "Annual Financial Statements" for the period ending December 31, 2012, and (iv) Section 4.5 of the Loan Agreement "Financial Reporting–Individual Guarantor" for the period ending December 31, 2012. The Borrower has requested that the Bank waive the Events of Default under the Loan Documents. The Borrower has requested that the Bank waive the Events of Default. In reliance upon the Borrower's representations and warranties and subject to the terms and conditions herein set forth, the Bank agrees to grant a waiver of the Events of Default that would otherwise result from a violation of such covenants solely for the above-referenced periods. The Borrower agrees that it will hereafter comply fully with these covenants and all other provisions of the Loan Documents,

-4-

which remain in full force and effect. Except as expressly described in this Amendment, this waiver shall not constitute (a) a modification or an alteration of the terms, conditions or covenants of the Loan Documents or (b) a waiver, release or limitation upon the Bank's exercise of any of its rights and remedies thereunder, which are hereby expressly reserved. This waiver shall not relieve or release the Borrower in any way from any of its respective duties, obligations, covenants or agreements under the Loan Documents or from the consequences of any Event of Default described above. This waiver shall not obligate the Bank, or be construed to require the Bank, to waive any other Events of Default or defaults, whether now existing or which may occur after the date of this waiver.

2. **Retained Note.** Concurrently with the execution and delivery of this Amendment, the Borrower shall execute and deliver to the Bank an amended and restated committed line of credit note (the "Retained Note") evidencing the loan in the principal amount of $1,250,000.00 (the "Line of Credit"), in form and substance satisfactory to the Bank. Upon receipt by the Bank of the Retained Note, the Existing Note shall be cancelled, the Line of Credit and all accrued and unpaid interest on the Existing Note shall thereafter be evidenced by the Retained Note, and all references to the "Note" evidencing the Line of Credit in any documents relating thereto shall thereafter be deemed to refer to the Retained Note. Without duplication, the Retained Note shall not constitute a novation and shall in no way extinguish the Borrower's unconditional obligation to repay all indebtedness, including accrued and unpaid interest, evidenced by the Existing Note.

3. The Loan Agreement is amended as follows:

(a) Section 1.1. of the Loan Agreement is hereby amended and restated to read in its entirety as follows:

"1.1. **Committed Line of Credit.** The first credit facility governed by this Loan Agreement is a committed revolving line of credit under which the Borrower may request and the Bank, subject to the terms and conditions of this Agreement, will make advances to the Borrower from time to time until the Expiration Date, in an amount in the aggregate at any time outstanding not to exceed $1,250,000.00 (the "Line of Credit"). The "Expiration Date" means June 30, 2017, or such later date as may be designated by the Bank by written notice from the Bank to the Borrower. Advances under the Line of Credit will be used for working capital or other general corporate purposes of the Borrower."

(b) Section (f) set forth in the FINANCIAL COVENANTS section of the Continuation of Addendum to the Loan Agreement is hereby amended and restated to read in its entirety as follows:

"(f) The Borrower will maintain at all times a Tangible Net Worth of $320,000.00."

4. The Borrowing Base Rider is amended as follows:

(a) The definition of "Borrowing Base" set forth in Section 3 of the Borrowing Base Rider is hereby amended and restated to read in its entirety as follows:

"**Borrowing Base**" at any time shall mean the lesser of (a) $1,250,000.00 (the maximum principal amount of the Facility) and (b) 80% of Qualified Accounts at such time. The value of Qualified Accounts at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered by the Borrower to the Bank."

C. Conditions to Effectiveness of Amendment; The Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions:

1. Execution by all parties and delivery to the Bank of this Amendment, including the attached Consent and the Retained Note.

## CONSENT OF GUARANTOR

Each of the undersigned guarantors (jointly and severally if more than one, the "Guarantor") consents to the provisions of the foregoing Amendment (the "Amendment") and all prior amendments (if any) and confirms and agrees that (a) the Guarantor's obligations under its respective Guaranty and Surety/ship Agreement dated December 3, 2012 (collectively if more than one, the "Guaranty"), relating to the Obligations mentioned in the Amendment, shall be unimpaired by the Amendment; (b) the Guarantor has no defenses, set offs, counterclaims, discounts or charges of any kind against the Bank, its officers, directors, employees, agents or attorneys with respect to the Guaranty; and (c) all of the terms, conditions and covenants in the Guaranty remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guaranty are true and correct.

The Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Guarantor or third parties (if applicable), shall continue unimpaired and in full force and effect, shall cover and secure all of the Guarantor's existing and future Obligations to the Bank, as modified by this Amendment.

By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile for the purposes of update, renewal or extension of such credit or additional credit and for the reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By his signature below, each such Guarantor affirms his/her identity as the respective individual(s) identified in the Guaranty.

The Guarantor ratifies and confirms the indemnification, confession of judgment (if applicable) and waiver of jury trial provisions contained in the Guaranty.

WITNESS the due execution of this Consent as a document under seal as of the date of this Amendment, intending to be legally bound hereby.

WITNESS / ATTEST:

_____          _____ (SEAL)
Print Name: Rebecca Andrews              KIM DUFLO

_____          _____ (SEAL)
Print Name: Rebecca Andrews              WAINO PIHL

_____          _____ (SEAL)
Print Name: Rebecca Andrews              KELVIN DUFLO

_____          _____ (SEAL)
Print Name: Rebecca Andrews              KRIS D. DUFLO

-7-

# Amendment to Loan Documents



**THIS AMENDMENT TO LOAN DOCUMENTS** (this **"Amendment"**) is made as of July _16_, 2014, by and between **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the **"Borrower"**), and **PNC BANK, NATIONAL ASSOCIATION** (the **"Bank"**).

## BACKGROUND

A.    The Borrower has executed and delivered to the Bank (or a predecessor which is now known by the Bank's name as set forth above), one or more promissory notes, letter agreements, loan agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made a part of this Amendment (collectively as amended from time to time, the **"Loan Documents"**) which evidence or secure some or all of the Borrower's obligations to the Bank for one or more loans or other extensions of credit (the **"Obligations"**).

B.    The Borrower and the Bank desire to amend the Loan Documents as provided for in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Certain of the Loan Documents are amended as set forth in Exhibit A.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents.  Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

2.    The Borrower hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment, (ii) ratified and confirmed without condition as if made anew, and (iii) incorporated into this Amendment by reference, (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document which will not be cured by the execution and effectiveness of this Amendment, (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained, and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms.  The Borrower confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

3.    The Borrower hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Borrower or third parties (if applicable), shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's existing and future Obligations to the Bank, as modified by this Amendment.

4.    As a condition precedent to the effectiveness of this Amendment, the Borrower shall comply with the terms and conditions (if any) specified in Exhibit A.

**Form 17A – Multistate  Rev. 3/14**

5.      To induce the Bank to enter into this Amendment, the Borrower waives and releases and forever discharges the Bank and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that it may have against the Bank or any of them arising out of or relating to the Obligations. The Borrower further agrees to indemnify and hold the Bank and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Bank or any of them on account of any claims arising out of or relating to the Obligations. The Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually executed counterpart.  Any party so executing this Amendment by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

7.      The Bank may modify this Amendment for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).

8.      This Amendment will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns.

9.      This Amendment has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated in the Loan Documents is located.  This Amendment will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State where the Bank's office indicated in the Loan Documents is located, excluding its conflict of laws rules.

# REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**Form 17A – Multistate  Rev. 3/14**

10.     Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Bank's rights and remedies (all of which are hereby reserved).  **The Borrower expressly ratifies and confirms the confession of judgment (if applicable) and waiver of jury trial or arbitration provisions contained in the Loan Documents.**

**WITNESS** the due execution of this Amendment as a document under seal as of the date first written above.

WITNESS / ATTEST:

**MID MICHIGAN FEED INGREDIENTS, L.L.C.**

_Fred T. Mitchell_

Print Name: _FRED T. Mitchell_
Title: _____
(Include title only if an officer of entity signing to the right)

By: _Waino Pihl_                    (SEAL)

Waino Pihl
Member

**PNC BANK, NATIONAL ASSOCIATION**

By: _Fredk T. Mitchell_          (SEAL)

Frederick T. Mitchell
Senior Vice President

- 3 -

**Form 17A – Multistate  Rev. 3/14**

**EXHIBIT A TO**
**AMENDMENT TO LOAN DOCUMENTS**
**DATED AS OF JULY 16, 2014**

A.  The "Loan Documents" that are the subject of this Amendment include the following (as any of the foregoing have previously been amended, modified or otherwise supplemented):

1.  $1,250,000.00 Amended and Restated Committed Line of Credit Note dated November 27, 2013 executed and delivered to the Bank by the Borrower

2.  Working Cash®, Line of Credit, Investment Sweep Rider, dated December 3, 2012, between the Borrower and the Bank

3.  Loan Agreement dated December 3, 2012 between the Borrower and the Bank (the "**Loan Agreement**")

4.  Borrowing Base Rider dated December 3, 2012, between the Borrower and the Bank (the "**Rider**")

5.  Security Agreement dated December 3, 2012 between the Borrower and the Bank

6.  Guaranty and Suretyship Agreement each dated December 3, 2012, executed and delivered to the Bank by each of:

> (a)  Waino Pihl;
> (b)  Kelvin Duflo;
> (c)  Kris D. Duflo; and
> (d)  Kim Duflo

7.  First Amendment to Loan Documents dated January 16, 2013 between the Borrower and the Bank

8.  Waiver and Amendment to Loan Documents dated November 27, 2013 between the Borrower and the Bank

9.  All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.  The Loan Documents are amended as follows:

1.  The Loan Agreement is amended as follows:

   (a)  Section 1.1.2. of the Loan Agreement is hereby deleted in its entirety.

   (b)  The Financial Covenants section of the Addendum to the Loan Agreement is hereby deleted in its entirety.

   (c)  Sections 4.2, 4.3 and 4.5 of the Loan Agreement are hereby amended and restated to read in their entity as follows:

- 4 -

"**4.2.**      **Tax Returns.**  Borrower's annual federal income tax returns within one hundred twenty (120) days of each fiscal year end, which tax returns shall be true and correct copies of the tax returns filed by Borrower with the Internal Revenue Service.

**4.3.**      **Annual Financial Statements.**   Furnish the Borrower's Financial Statements to the Bank within 120 days after the end of each fiscal year.  Those Financial Statements will be prepared on a compiled basis in accordance with GAAP by an independent certified public accountant selected by the Borrower and satisfactory to the Bank.  As used in this Agreement, **"Financial Statements"** means the Borrower's consolidated and, if required by the Bank in its sole discretion, consolidating balance sheets, income statements and statements of cash flows for the year, month or quarter together with year-to-date figures and comparative figures for the corresponding periods of the prior year.

**4.5.**      **Guarantor's Financial Reporting - Individual Guarantor.**   Annual federal income tax returns within 30 days of filing and personal financial statements for the Individual Guarantor (as defined herein) within one hundred twenty (120) days of each calendar year end, which tax returns shall be true and correct copies of the tax returns filed by Individual Guarantor with the Internal Revenue Service.  As used herein, "**Individual Guarantor**" shall mean each Guarantor, who is a natural person."

2.     The Rider is hereby terminated and releases the Borrower from its obligations thereunder, effective as of the date of this Amendment.

C.     Conditions to Effectiveness of Amendment: The Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions:

1.     Execution by all parties and delivery to the Bank of this Amendment, including the attached Consent.

Form 17A – Multistate  Rev. 3/14

## CONSENT OF GUARANTOR

Each of the undersigned guarantors (jointly and severally if more than one, the "**Guarantor**") consents to the provisions of the foregoing Amendment and all prior amendments (if any) and confirms and agrees that: (a) the Guarantor's obligations under its Guaranty and Suretyship Agreement each dated December 3, 2012 (collectively if more than one, the "**Guaranty**"), relating to the Obligations mentioned in the Amendment, shall be unimpaired by the Amendment; (b) the Guarantor has no defenses, set offs, counterclaims, discounts or charges of any kind against the Bank, its officers, directors, employees, agents or attorneys with respect to the Guaranty; and (c) all of the terms, conditions and covenants in the Guaranty remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guaranty are true and correct.

The Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Guarantor or third parties (if applicable), shall continue unimpaired and in full force and effect, shall cover and secure all of the Guarantor's existing and future Obligations to the Bank, as modified by this Amendment.

By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, each such Guarantor affirms his/her identity as the respective individual(s) identified in the Guaranty.

**The Guarantor ratifies and confirms the indemnification, confession of judgment (if applicable) and waiver of jury trial or arbitration provisions contained in the Guaranty.**

**WITNESS** the due execution of this Consent as a document under seal as of the date of this Amendment, intending to be legally bound hereby.

WITNESS / ATTEST:

Print Name: _Fred T. Mitchell_

Print Name: _Fred T. Mitchell_

Print Name: _Fred T. Mitchell_

Print Name: _Fred T. Mitchell_

_____ (SEAL)
**WAINO PIHL**

_____ (SEAL)
**KELVIN DUFLO**

_____ (SEAL)
**KRIS D. DUFLO**

_____ (SEAL)
**KIM DUFLO**

- 6 -

## CONSENT OF GUARANTOR

Each of the undersigned guarantors (jointly and severally if more than one, the "**Guarantor**") consents to the provisions of the foregoing Amendment and all prior amendments (if any) and confirms and agrees that: (a) the Guarantor's obligations under its Guaranty and Suretyship Agreement each dated December 3, 2012 (collectively if more than one, the "**Guaranty**"), relating to the Obligations mentioned in the Amendment, shall be unimpaired by the Amendment; (b) the Guarantor has no defenses, set offs, counterclaims, discounts or charges of any kind against the Bank, its officers, directors, employees, agents or attorneys with respect to the Guaranty; and (c) all of the terms, conditions and covenants in the Guaranty remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guaranty are true and correct.

The Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Guarantor or third parties (if applicable), shall continue unimpaired and in full force and effect, shall cover and secure all of the Guarantor's existing and future Obligations to the Bank, as modified by this Amendment.

By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, each such Guarantor affirms his/her identity as the respective individual(s) identified in the Guaranty.

**The Guarantor ratifies and confirms the indemnification, confession of judgment (if applicable) and waiver of jury trial or arbitration provisions contained in the Guaranty.**

**WITNESS** the due execution of this Consent as a document under seal as of the date of this Amendment, intending to be legally bound hereby.

WITNESS / ATTEST:

_____

Print Name: _Fred T. Mitchell_

_____

Print Name: _Fred T. Mitchell_

_____

Print Name: _Fred T. Mitchell_

_____

Print Name: _Fred T. Mitchell_

_____ (SEAL)

**WAINO PIHL**

_____ (SEAL)

**KELVIN DUFLO**

_____ (SEAL)

**KRIS D. DUFLO**

_____ (SEAL)

**KIM DUFLO**

- 6 -

**Form 17A – Multistate  Rev. 3/14**

PAGE 1/1 * RCVD AT 7/17/2014 8:49:13 AM [Eastern Daylight Time] * SVR:WCRGF309A/0 * DNIS:51569 * CS

# Amendment to Loan Documents



**THIS AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is dated December _8_, 2017, effective as of November 30, 2017, by and between **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**") and **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**").

## BACKGROUND

A.     The Borrower has executed and delivered to the Bank (or a predecessor which is now known by the Bank's name as set forth above), one or more promissory notes, letter agreements, loan agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made a part of this Amendment (collectively as amended from time to time, the "**Loan Documents**") which evidence or secure some or all of the Borrower's obligations to the Bank for one or more loans or other extensions of credit (the "**Obligations**").

B.     The Borrower and the Bank entered into a First Amendment to Loan Documents dated as of January 16, 2013, a Waiver and Amendment to Loan Documents dated as of November 27, 2013, and an Amendment to Loan Documents dated as of July 16, 2014. The Borrower and the Bank desire to further amend the Loan Documents as provided for in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

1.     Certain of the Loan Documents are amended as set forth in Exhibit A.  Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment.  This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.  To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

2.     The Borrower hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment, (ii) ratified and confirmed without condition as if made anew, and (iii) incorporated into this Amendment by reference, (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document which will not be cured by the execution and effectiveness of this Amendment, (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained, and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms.  The Borrower confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

3.     The Borrower hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Borrower or third parties (if applicable), shall continue

unimpaired and in full force and effect, and shall cover and secure all of the Borrower's existing and future Obligations to the Bank, as modified by this Amendment.

4.      As a condition precedent to the effectiveness of this Amendment, the Borrower shall comply with the terms and conditions (if any) specified in Exhibit A.

5.      To induce the Bank to enter into this Amendment, the Borrower waives and releases and forever discharges the Bank and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that it may have against the Bank or any of them arising out of or relating to the Obligations. The Borrower further agrees to indemnify and hold the Bank and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Bank or any of them on account of any claims arising out of or relating to the Obligations. The Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually executed counterpart. Upon written request by the other party (which may be made by electronic mail), any party so executing this Amendment by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

7.      Notwithstanding any other provision herein or in the other Loan Documents, the Borrower agrees that this Amendment, the Note, the other Loan Documents, any other amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention. The Borrower and the Bank acknowledge and agree that the methods for delivering Communications, including notices, under the Loan Documents include electronic transmittal to any electronic address provided by either party to the other party from time to time.

8.      The Bank may modify this Amendment for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).

9.      This Amendment will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns.

10.      This Amendment has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated in the Loan Documents is located. This Amendment will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State where the Bank's office indicated in the Loan Documents is located, excluding its conflict of laws rules, including without limitation the Electronic Transactions Act (or equivalent) in such State (or, to the extent controlling, the laws of the United States of America, including without limitation the Electronic Signatures in Global and National Commerce Act).

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**Form 17A – Multistate Rev. 4/17**

11.    Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Bank's rights and remedies (all of which are hereby reserved).  **The Borrower expressly ratifies and confirms the waiver of jury trial or arbitration provisions contained in the Loan Documents, all of which are incorporated herein by reference.**

**WITNESS** the due execution of this Amendment as a document under seal as of the date first written above.

WITNESS / ATTEST:                         MID MICHIGAN FEED INGREDIENTS, L.L.C.

_Keary A Richardson_                      By: _Waino Pihl_
Print Name: _Keary A Richardson_                              (SEAL)
Title:_____            Name:  Waino Pihl
(Include title only if an officer of entity signing to the right)    Title:    Member


PNC BANK, NATIONAL ASSOCIATION

By:_____
                              (SEAL)
Name:  Brett A. Crow
Title:    Vice President

Form 17A – Multistate Rev. 4/17

**EXHIBIT A TO**
**AMENDMENT TO LOAN DOCUMENTS**
**DATED DECEMBER _8_ , 2017, EFFECTIVE AS OF NOVEMBER 30, 2017**

A.  The "Loan Documents" that are the subject of this Amendment include the following (as any of the foregoing have previously been amended, modified or otherwise supplemented):

  1.  Amended and Restated Committed Line of Credit Note dated as of November 27, 2013 in the original amount of $1,250,000.00 executed and delivered by Borrower to the Bank (the "**Note**").

  2.  Working Cash®, Line of Credit, Investment Sweep Rider dated December 3, 2012 between Borrower and the Bank ("**Working Cash Sweep Rider**").

  3.  Loan Agreement dated December 3, 2012 between Borrower and the Bank (the "**Loan Agreement**").

  4.  Security Agreement dated December 3, 2012 between Borrower and the Bank.

  5.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Waino Pihl.

  6.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Kelvin Duflo.

  7.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Kris D. Duflo.

  8.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Kim Duflo.

  9.  First Amendment to Loan Documents dated as of January 16, 2013.

  10.  Waiver and Amendment to Loan Documents dated as of November 27, 2013.

  11.  Amendment to Loan Documents dated as of July 16, 2014.

  12.  All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.  The Loan Documents are amended as follows:

  1.  **Restated Note.** Concurrently with the execution and delivery of this Amendment, the Borrower shall execute and deliver to the Bank an amended and restated term note (the "Restated Note") evidencing the term loan in the principal amount of $1,250,000.00, which shall mature on June 1, 2018, in form and substance satisfactory to the Bank.  Upon receipt by the Bank of the Restated Note, the existing Note shall be canceled; the line of credit loan evidenced thereby and all accrued and unpaid interest on the existing Note shall thereafter be evidenced by the Restated Note; and all references to the existing "Note" evidencing the line of credit loan in any documents relating thereto shall thereafter be deemed to refer to the Restated Note.  Without duplication, the Restated Note shall not constitute a novation and shall in no way extinguish the Borrower's unconditional obligation to repay all indebtedness, including accrued and unpaid interest,

Form 17A – Multistate Rev. 4/17

evidenced by the existing Note. Nothing herein is intended to impair the lien priority of effect of any security agreement, pledge agreement or mortgage with respect to the Borrower's obligations under the existing Note as replaced by the Restated Note and under any other documents relating thereto.

2. **Guaranty of Gratiot Ag Investments, L.L.C**. To further secure the Obligations, Borrower shall cause Gratiot Ag Investments, L.L.C. to execute and deliver to the Bank an unlimited guaranty of the Obligations, in form and substance satisfactory to the Bank.

3. **Guaranty of JBT Grain Company, L.L.C**. To further secure the Obligations, Borrower shall cause JBT Grain Company, L.L.C. to execute and deliver to the Bank an unlimited guaranty of the Obligations, in form and substance satisfactory to the Bank.

4. The Working Cash Sweep Rider is terminated.

5. Section 1.1 of the Loan Agreement is amended and restated to read in its entirety as follows:

"1.1. **Term Loan.** One of the Loans governed by this Agreement is a term loan in the amount of $1,250,000.00 (the "**Term Loan**")."

6. Section 1.1.1. of the Loan Agreement is deleted in its entirety.

7. Section 3.2 of the Loan Agreement is amended and restated to read in its entirety as follows:

"**3.2. Financial Statements.** The Borrower has delivered or caused to be delivered to the Bank its most recent Financial Statements (as defined herein). The Financial Statements are true, complete and accurate in all material respects and fairly present the Borrower's financial condition, assets and liabilities, whether accrued, absolute, contingent or otherwise and the results of the Borrower's operations for the period specified therein. The Financial Statements have been prepared in accordance with generally accepted accounting principles in effect from time to time ("**GAAP**") consistently applied from period to period, subject in the case of interim statements to normal year-end adjustments and to any comments and notes acceptable to the Bank in its sole discretion. As used herein, "**Financial Statements**" shall mean (i) with respect to an entity that is not a natural person, consolidated and, if required by the Bank in its sole discretion, consolidating balance sheets statements of income and cash flows for the year, month or quarter together with year-to-date figures and comparative figures for the corresponding periods of the prior year, prepared in accordance with GAAP, consistently applied from period to period; and (ii) with respect to natural persons, means personal financial statement and federal income tax returns."

8. Section 4.2 of the Loan Agreement is amended and restated to read in its entirety as follows:

"**4.2. Financial Reporting.** Deliver or cause to be delivered to the Bank (i) the Financial Statements, reports and certifications, if any, set forth on the Addendum and (ii) such other information about Borrower's or Guarantor's financial condition, properties and operations as and when requested by the Bank, from time to time. As used herein, "**Guarantor**" shall collectively refer to each Entity Guarantor and Individual Guarantor of the Obligations, jointly and severally; "**Entity Guarantor**" shall mean each Guarantor who is not a natural person; and "**Individual Guarantor**" shall mean each Guarantor who is a natural person."

9. Sections 4.3, 4.4 and 4.5 of the Loan Agreement are deleted in their entirety.

Form 17A – Multistate Rev. 4/17

10.  Sections 4.6, 4.7, 4.8, 4.9, 4.10, 4.11 and 4.12 of the Loan Agreement are renumbered as Sections 4.3, 4.4, 4.5, 4.6, 4.7, 4.8 and 4.9 respectively.

11.  The Addendum to the Loan Agreement is amended and restated in its entirety as follows:

## "ADDENDUM

**ADDENDUM** to that certain Loan Agreement dated December 3, 2012 between Mid Michigan Feed Ingredients, L.L.C. as the Borrower and PNC Bank, National Association, as the Bank.  Capitalized terms used in this Addendum and not otherwise defined shall have the meanings given them in the Agreement.  Section numbers below refer to the sections of the Agreement.

**3.6**  **Title to Assets.** Describe additional liens and encumbrances below:

*None known*

**3.7**  **Litigation.** Describe pending and threatened litigation, investigations, proceedings, etc. below:

*PNC Bank is aware of possible litigation between Mid Michigan Feed Ingredients and its customer Kurncz Farms Inc.*

**3.10**  **Environmental Matters.**  Describe pending or threatened litigation or proceeding arising under, relating to or in connection with any Environmental Law below:

*None known*

Form 17A – Multistate Rev. 4/17

**CONTINUATION OF ADDENDUM**

4.2     **Financial Reporting Requirements.**

    1.     **Borrower's Financial Reporting.**

        (a)     **Interim Financial Statements.**  Within ten (10) days after the end of each month, the Borrower's Financial Statements for such period, in reasonable detail, certified by an authorized officer of the Borrower and prepared in accordance with GAAP, consistently applied from period to period.

        (b)     **Annual Financial Statements.**  Within one hundred twenty (120) days after the end of each fiscal year, the Borrower's annual Financial Statements.  The Financial Statements will be prepared on a compiled basis in accordance with GAAP by an independent certified public accountant selected by the Borrower and satisfactory to the Bank.  Audited Financial Statements shall contain the unqualified opinion of an independent certified public accountant and all accountant examinations shall have been made in accordance with GAAP consistently applied from period to period.

        (c)     **Tax Returns.**  Borrower's annual federal income tax returns within one hundred twenty (120) days of each fiscal year end, which tax returns shall be true and correct copies of the tax returns filed by Borrower with the Internal Revenue Service.

        (d)     **Accounts Receivable and Accounts Payable Agings.**  Within ten (10) days following the end of each month, the Borrower's detailed schedule of accounts receivable and accounts payable aging analysis.

        (e)     **Cash Flow Report**.  Within ten (10) days following the end of each month, a 13-week cash flow report, in form and substance satisfactory to the Bank.

    2.     **Guarantor's Financial Reporting - Entity Guarantor.**

        (a)     **Interim Financial Statements.**  Within ten (10) days after the end of each month, the Entity Guarantor's Financial Statements for such period, in reasonable detail, certified by an authorized officer of the Entity Guarantor and prepared in accordance with GAAP consistently applied from period to period.

        (b)     **Annual Financial Statements.**  Within one hundred twenty (120) days after the end of each fiscal year, Entity Guarantor's Financial Statements to the Bank.  The Financial Statements will be prepared on a compiled basis in accordance with GAAP by an independent certified public accountant selected by the Borrower and satisfactory to the Bank.  Audited Financial Statements shall contain the unqualified opinion of an independent certified public accountant and all accountant examinations shall have been made in accordance with GAAP consistently applied from period to period.

        (c)     **Tax Returns.**  Entity Guarantor's annual federal income tax returns within one hundred twenty (120) days of each fiscal year end, which tax returns shall be true and correct copies of the tax returns filed by Entity Guarantor with the Internal Revenue Service.

    3.     **Guarantor's Financial Reporting - Individual Guarantor.**  Annual (i) federal income tax returns for the Individual Guarantor within thirty (30) days of the date Individual Guarantor files its annual, federal income tax returns with the Internal Revenue Service and, in any event, on or before October 31 of each calendar year, which tax returns shall be true and correct copies of the tax returns filed by Individual Guarantor

Form 17A – Multistate Rev. 4/17

with the Internal Revenue Service and (ii) personal financial statements for the Individual Guarantor within one hundred twenty (120) days of each calendar year end."

    C.     Conditions to Effectiveness of Amendment: The Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions:

1. Execution by all parties and delivery to the Bank of this Amendment, including the attached Consent(s).

2. Execution and delivery to the Bank of the Restated Note, executed and delivered by the Borrower.

3. Execution and delivery to the Bank of an unlimited guaranty of the Obligations, executed and delivered by Gratiot Ag Investments, L.L.C.

4. Execution and delivery to the Bank of an unlimited guaranty of the Obligations, executed and delivered by JBT Grain Company, L.L.C.

5. Payment by the Borrower to the Bank of an amendment fee in the amount of $1,000.00.

6. Borrower shall reimburse the Bank for its attorney fees, expenses and costs incurred in the administration of the Obligations, including those incurred in the drafting of this Amendment and other loan documents, which attorney fees, expenses and costs as of the date of this Amendment are $1,517.00.

**Form 17A – Multistate Rev. 4/17**

## CONSENT OF GUARANTOR

Each of the undersigned guarantors (jointly and severally if more than one, the "**Guarantor**") consents to the provisions of the foregoing Amendment and all prior amendments (if any) and confirms and agrees that: (a) the Guarantor's obligations under its Guaranty and Suretyship Agreement dated December 3, 2012 (collectively if more than one, the "**Guaranty**"), relating to the Obligations mentioned in the Amendment, shall be unimpaired by the Amendment; (b) the Guarantor has no defenses, set offs, counterclaims, discounts or charges of any kind against the Bank, its officers, directors, employees, agents or attorneys with respect to the Guaranty; and (c) all of the terms, conditions and covenants in the Guaranty remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guaranty are true and correct.

The Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Guarantor or third parties (if applicable), shall continue unimpaired and in full force and effect, shall cover and secure all of the Guarantor's existing and future Obligations to the Bank, as modified by this Amendment.

By signing below, the Guarantor agrees that this Consent, the Guaranty, the other Loan Documents, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention. The Guarantor acknowledges and agrees that the methods for delivering Communications, including notices, under the Guaranty and the other Loan Documents include electronic transmittal to any electronic address provided by any party to the other party from time to time.

By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, each such Guarantor affirms his/her identity as the respective individual(s) identified in the Guaranty.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Form 17A – Multistate Rev. 4/17

The Guarantor ratifies and confirms the indemnification and waiver of jury trial or arbitration provisions contained in the Guaranty, all of which are incorporated herein by reference.

WITNESS the due execution of this Consent as a document under seal as of the date of this Amendment, intending to be legally bound hereby.

WITNESS / ATTEST:

Print Name: Keary A Richardson

(Individual)                                                    (SEAL)
Name: **Waino Pihl**

Print Name: Keary A Richardson

(Individual)                                                    (SEAL)
Name: **Kelvin Duflo**

Print Name: Keary A Richardson

(Individual)                                                    (SEAL)
Name: **Kris D. Duflo**

Print Name: Keary A Richardson

(Individual)                                                    (SEAL)
Name: **Kim Duflo**

Open.21511.73997.19425351-1

- 10 -

Form 17A – Multistate Rev. 4/17

# Amendment to Loan Documents

 **PNC**

**THIS AMENDMENT TO LOAN DOCUMENTS** (this "**Amendment**") is dated July _3l_ , 2018, effective as of June 1, 2018, by and between **MID MICHIGAN FEED INGREDIENTS, L.L.C.** (the "**Borrower**"), and **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**").

## BACKGROUND

A.     The Borrower or another obligor has executed and delivered to the Bank (or a predecessor which is now known by the Bank's name as set forth above), one or more promissory notes, letter agreements, loan agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made a part of this Amendment (collectively as amended from time to time, the "**Loan Documents**") which evidence or secure some or all of the indebtedness and other obligations of the Borrower to the Bank for one or more loans or other extensions of credit (as used herein, collectively, together with the Obligations, if and as defined in the Loan Documents, the "**Obligations**"). Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents.

B.     The Borrower and the Bank entered into a First Amendment to Loan Documents dated as of January 16, 2013, a Waiver and Amendment to Loan Documents dated as of November 27, 2013, an Amendment to Loan Documents dated as of July 16, 2014, and an Amendment to Loan Documents dated as of December 8, 2017, effective as of November 30, 2017. The Borrower and the Bank desire to further amend the Loan Documents as provided for in this Amendment.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

1.     Certain of the Loan Documents are amended as set forth in Exhibit A. Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment. This Amendment is deemed incorporated into each of the Loan Documents. To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

2.     The Borrower hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment, (ii) ratified and confirmed without condition as if made anew, and (iii) incorporated into this Amendment by reference, (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document which will not be cured by the execution and effectiveness of this Amendment, (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained, and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms.  The Borrower confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

**Form 17A – Multistate  Rev. 5/18**

3.      The Borrower hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Borrower or third parties (if applicable), shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's existing and future Obligations to the Bank, as modified by this Amendment.

4.      As a condition precedent to the effectiveness of this Amendment, the Borrower shall comply with the terms and conditions (if any) specified in Exhibit A.

5.      To induce the Bank to enter into this Amendment, the Borrower waives and releases and forever discharges the Bank and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that it may have against the Bank or any of them arising out of or relating to the Obligations. The Borrower further agrees to indemnify and hold the Bank and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Bank or any of them on account of any claims arising out of or relating to the Obligations. The Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6.      This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually executed counterpart. Upon written request by the other party (which may be made by electronic mail), any party so executing this Amendment by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

7.      Notwithstanding any other provision herein or in the other Loan Documents, the Borrower agrees that this Amendment, the Note, the other Loan Documents, any other amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a **"Communication"**) may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention. The Borrower and the Bank acknowledge and agree that the methods for delivering Communications, including notices, under the Loan Documents include electronic transmittal to any electronic address provided by either party to the other party from time to time.

8.      The Bank may modify this Amendment for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that the Bank shall send a copy of any such modification to the Borrower (which notice may be given by electronic mail).

9.      This Amendment will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns.

10.     This Amendment has been delivered to and accepted by the Bank and will be deemed to be made in the State where the Bank's office indicated in the Loan Documents is located. This Amendment will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State where the Bank's office indicated in the Loan Documents is located, excluding its conflict of laws rules, including without limitation the Electronic Transactions Act (or equivalent) in such State (or, to the extent controlling, the laws of the United States of America, including without limitation the Electronic Signatures in Global and National Commerce Act).

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**Form 17A – Multistate Rev. 5/18**

11.     Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed.  Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Bank's rights and remedies (all of which are hereby reserved).  **The Borrower expressly ratifies and confirms the waiver of jury trial or arbitration provisions contained in the Loan Documents, all of which are incorporated herein by reference.**

**WITNESS** the due execution of this Amendment as a document under seal as of the date first written above.

WITNESS / ATTEST:

**MID MICHIGAN FEED INGREDIENTS, L.L.C.**

By: _Waino Pihl_

(SEAL)

Print Name: _Keary A. Richardson_

Name:  Waino Pihl

Title: _Accountant_

Title:    Member

(Include title only if an officer of entity signing to the right)

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

(SEAL)

Name:  Brett A. Crow

Title:    Vice President

**Form 17A – Multistate Rev. 5/18**

**EXHIBIT A TO**
**AMENDMENT TO LOAN DOCUMENTS**
**DATED JULY __3/__ , 2018, EFFECTIVE AS OF JUNE 1, 2018**

A.  The "Loan Documents" that are the subject of this Amendment include the following (as any of the foregoing have previously been amended, modified or otherwise supplemented):

1.  Amended and Restated Term Note dated as of December 8, 2017 in the original amount of $1,250,000.00 executed and delivered by Borrower to the Bank (the **"Note"**).

2.  Loan Agreement dated December 3, 2012 between Borrower and the Bank (the **"Loan Agreement"**).

3.  Security Agreement dated December 3, 2012 between Borrower and the Bank.

4.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Waino Pihl.

5.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Kelvin Duflo.

6.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Kris D. Duflo.

7.  Guaranty and Suretyship Agreement dated December 3, 2012 executed and delivered to the Bank by Kim Duflo.

8.  Guaranty and Suretyship Agreement dated December 8, 2017 executed and delivered to the Bank by Gratiot Ag Investment, L.L.C.

9.  Guaranty and Suretyship Agreement dated December 8, 2017 executed and delivered to the Bank by JBT Grain Company, L.L.C.

10.  First Amendment to Loan Documents dated as of January 16, 2013.

11.  Waiver and Amendment to Loan Documents dated as of November 27, 2013.

12.  Amendment to Loan Documents dated as of July 16, 2014.

13.  Amendment to Loan Documents dated as of December 8, 2017, effective as of November 30, 2017.

14.  All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.  The Loan Documents are amended as follows:

1.  **Restated Note**. Concurrently with the execution and delivery of this Amendment, the Borrower shall execute and deliver to the Bank an amended and restated term note (the **"Restated Note"**) evidencing the term loan in the principal amount of $1,199,530.30, which shall mature on April 1, 2019, in form and substance satisfactory to the Bank. Upon receipt by the Bank of the Restated

- 4 -

**Form 17A – Multistate Rev. 5/18**

Note, the existing Note shall be canceled; the term loan evidenced thereby and all accrued and unpaid interest on the existing Note shall thereafter be evidenced by the Restated Note; and all references to the existing "Note" evidencing the term loan in any documents relating thereto shall thereafter be deemed to refer to the Restated Note. Without duplication, the Restated Note shall not constitute a novation and shall in no way extinguish the Borrower's unconditional obligation to repay all indebtedness, including accrued and unpaid interest, evidenced by the existing Note. Nothing herein is intended to impair the lien priority or effect of any security agreement, pledge agreement or mortgage with respect to the Borrower's obligations under the existing Note as replaced by the Restated Note and under any other documents relating thereto.

2.    **Engagement of Consultant.**    Borrower shall engage a third party financial consultant, at Borrower's expense and acceptable to the Bank, on or before August 17, 2018.    Borrower shall provide to the Bank any reports prepared by the consultant. Such consultant shall assist Borrower in developing and implementing a plan to improve Borrower's operations and operating performance.

3.    Section 1.1 of the Loan Agreement is amended and restated to read in its entirety as follows:

"1.1 **Term Loan.** One of the Loans governed by this Agreement is a term loan in the amount of $1,199,530.30 (the **"Term Loan"**)."

4.    Section 4.2.1(b) of the Loan Agreement is amended and restated to read in its entirety as follows:

"(b) **Annual Financial Statements.**  Within one hundred twenty (120) days after the end of each fiscal year, the Borrower's annual Financial Statements. The Financial Statements will be prepared on a reviewed basis in accordance with GAAP by an independent certified public accountant selected by the Borrower and satisfactory to the Bank. Audited Financial Statements shall contain the unqualified opinion of an independent certified public accountant and all accountant examinations shall have been made in accordance with GAAP consistently applied from period to period."

5.    Section 4.2.2(b) of the Loan Agreement is amended and restated to read in its entirety as follows:

"(b) **Annual Financial Statements.**  Within one hundred twenty (120) days after the end of each fiscal year, Entity Guarantor's Financial Statements to the Bank. The Financial Statements will be prepared on a reviewed basis in accordance with GAAP by an independent certified public accountant selected by the Borrower and satisfactory to the Bank. Audited Financial Statements shall contain the unqualified opinion of an independent certified public accountant and all accountant examinations shall have been made in accordance with GAAP consistently applied from period to period."

6.    The following two provisions are hereby added to the Loan Agreement:

"**Beneficial Owners.**  The Borrower hereby represents and warrants that the information in the certification of beneficial owner(s) in the form requested by the Bank (the "**Certification of Beneficial Owners**"), as executed and delivered to the Bank and updated from time to time in accordance with this Agreement, is true, complete and correct as of the date hereof and as of the date any such update is delivered.  The Borrower acknowledges and agrees that the Certification of Beneficial Owners is a Loan Document."

"**Certification of Beneficial Owners and Other Additional Information.**    The Borrower agrees that until all Obligations have been paid in full and any commitments of the Bank to the Borrower have been terminated, the Borrower will provide: (i) confirmation of the

- 5 -

accuracy of the information set forth in the most recent Certification of Beneficial Owners provided to the Bank, as and when requested by the Bank; (ii) a new Certification of Beneficial Owners in form and substance acceptable to the Bank when the individual(s) identified as a controlling party and/or a direct or indirect individual owner on the most recent Certification of Beneficial Owners provided to the Bank have changed; and (iii) such other information and documentation as may reasonably be requested by the Bank from time to time for purposes of compliance by the Bank with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by the Bank to comply therewith."

C.  Post-Closing Conditions: To further secure the Obligations, within sixty (60) days of the date of execution of this Amendment, Borrower shall grant, or cause to be granted, additional collateral to the Bank which is acceptable to the Borrower and the Bank.

D.  Conditions to Effectiveness of Amendment: The Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions:

1.  Execution by all parties and delivery to the Bank of this Amendment, including the attached Consent.

2.  Execution and delivery to the Bank of the Restated Note, executed and delivered by the Borrower.

3.  Payment by the Borrower to the Bank of an amendment fee in the amount of $1,000.00.

4.  Borrower shall reimburse the Bank for its attorney fees, expenses and costs incurred in the administration of the Obligations, including those incurred in the drafting of this Amendment and other loan documents, which attorney fees, expenses and costs as of the date of this Amendment are $1,127.50.

**Form 17A – Multistate Rev. 5/18**

## CONSENT OF GUARANTOR

Each of the undersigned guarantors (jointly and severally if more than one, the "**Guarantor**") consents to the provisions of the foregoing Amendment and all prior amendments (if any) and confirms and agrees that: (a) the Guarantor's obligations under its Guaranty and Suretyship Agreement dated December 3, 2012 and December 8, 2017 (collectively if more than one, the "**Guaranty**"), relating to the Obligations mentioned in the Amendment, shall be unimpaired by the Amendment; (b) the Guarantor has no defenses, set offs, counterclaims, discounts or charges of any kind against the Bank, its officers, directors, employees, agents or attorneys with respect to the Guaranty; and (c) all of the terms, conditions and covenants in the Guaranty remain unaltered and in full force and effect and are hereby ratified and confirmed and apply to the Obligations, as modified by the Amendment. The Guarantor certifies that all representations and warranties made in the Guaranty are true and correct.

The Guarantor hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Guarantor or third parties (if applicable), shall continue unimpaired and in full force and effect, shall cover and secure all of the Guarantor's existing and future Obligations to the Bank, as modified by this Amendment.

By signing below, the Guarantor agrees that this Consent, the Guaranty, the other Loan Documents, any amendments thereto and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at the Bank's option, be in the form of an electronic record. Any Communication may, at the Bank's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention. The Guarantor acknowledges and agrees that the methods for delivering Communications, including notices, under the Guaranty and the other Loan Documents include electronic transmittal to any electronic address provided by any party to the other party from time to time.

By signing below, each Guarantor who is an individual provides written authorization to the Bank or its designee (and any assignee or potential assignee hereof) to obtain the Guarantor's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, each such Guarantor affirms his/her identity as the respective individual(s) identified in the Guaranty.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Form 17A – Multistate Rev. 5/18

The Guarantor ratifies and confirms the indemnification and waiver of jury trial or arbitration provisions contained in the Guaranty, all of which are incorporated herein by reference.

WITNESS the due execution of this Consent as a document under seal as of the date of this Amendment, intending to be legally bound hereby.

WITNESS / ATTEST:

Print Name: _Keary A. Richardson_

(Individual)                                    (SEAL)
Name: **Waino Pihl**

Print Name: _Keary A Richardson_

(Individual)                                    (SEAL)
Name: **Kelvin Duflo**

Print Name: _Keary A Richardson_

(Individual)                                    (SEAL)
Name: **Kris D. Duflo**

Print Name: _Keary A Richardson_

(Individual)                                    (SEAL)
Name: **Kim Duflo**

**GRATIOT AG INVESTMENTS, L.L.C.**

Print Name: _Keary A. Richardson_
Title: _Accountant_
(Include title only if an officer of entity signing to the right)

By: _____
                                    (SEAL)

Name: Waino Pihl
Title:   Member

WITNESS / ATTEST:

**JBT GRAIN COMPANY, L.L.C.**

Print Name: _Keary A. Richardson_
Title: _Accountant_
(Include title only if an officer of entity signing to the right)

By: _____
                                    (SEAL)

Name:  Waino Pihl
Title:   Member

Open.21511.73997.20555674-2

- 8 -

Form 17A – Multistate Rev. 5/18

Exhibit G

Michigan Department of State - Uniform Commercial Code

Document Number:

**2012176622-6**

Filing Date and Time:

12/20/2012 1:47:34 PM

*(This document was filed electronically.)*

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Corporation Service Company

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Corporation Service Company

801 Adlai Stevenson Drive

Springfield                    IL    62703

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Mid Michigan Feed Ingredients, L.L.C. | | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 102 South Robinson Street | Perrinton | MI | 48871 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | MI | D7961A | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| PNC Bank, National Association | | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 249 Fifth Ave Mailstop P1-POPP-LB-7 | Pittsburgh | PA | 15222 | USA |

4. This FINANCING STATEMENT covers the following collateral:

"Collateral" shall include all personal property of the Debtor, including the following, all whether now owned or hereafter acquired or arising and wherever located: (i) accounts (including health-care-insurance receivables and credit card receivables); (ii) securities entitlements, securities accounts, commodity accounts, commodity contracts and investment property; (iii) deposit accounts; (iv) instruments (including promissory notes); (v) documents (including warehouse receipts); (vi) chattel paper (including electronic chattel paper and tangible chattel paper); (vii) inventory, including raw materials, work in process, or materials used or consumed in Grantor's business, items held for sale or lease or furnished or to be furnished under contracts of service, sale or lease, goods that are returned, reclaimed or repossessed; (viii) goods of every nature, including stock-in-trade, goods on consignment, standing timber that is to be cut and removed under a conveyance or contract for sale, the unborn young of animals, crops grown, growing, or to be grown, manufactured homes, computer programs embedded in such goods and farm products; (ix) equipment, including machinery, vehicles and furniture; (x) fixtures; (xi) agricultural liens; (xii) as-extracted collateral; (xiii) commercial tort claims, if any, described on Exhibit "A" hereto; (xiv) letter of credit rights; (xv) general intangibles, of every kind and description, including payment intangibles, software, computer information, source codes, object codes, records and data, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, blueprints, drawings, designs and plans, trade secrets, contracts, licenses, license

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA
ACBS :LC   [72191983]

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## UCC FINANCING STATEMENT **ADDENDUM**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

OR

| 9a. ORGANIZATION'S NAME |
| --- |
| Mid Michigan Feed Ingredients, L.L.C. |

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
| --- | --- | --- |
| | | |

**10. MISCELLANEOUS:**

Michigan Department of State - Uniform Commercial Code

Document Number:
**2012176622-6**

Filing Date and Time:
**12/20/2012 1:47:34 PM**

*(This document was filed electronically.)*

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only <u>one</u> name (11a or 11b) - do not abbreviate or combine names

OR

| 11a. ORGANIZATION'S NAME |
| --- |
| |

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

| 11d. <u>SEE INSTRUCTIONS</u> | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
| --- | --- | --- | --- | --- |
| | | | | ☐ NONE |

**12.** ☐ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S NAME** - insert only <u>one</u> name (12a or 12b)

OR

| 12a. ORGANIZATION'S NAME |
| --- |
| |

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:
agreements, formulae, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (xvi) all supporting obligations of all of the foregoing property; (xvii) all property of the Debtor now or hereafter in the Secured Party's possession or in transit to or from, or under the custody or control of, the Secured Party or any affiliate thereof; (xviii) all cash and cash equivalents thereof; and (xix) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof.  The Collateral shall also include any and all other tangible or intangible property that is described as being part of the Collateral pursuant to one or more Riders to Security Agreement that may be attached hereto or delivered in connection herewith, including the Rider to Security Agreement   Copyrights, the Rider to Security Agreement   Patents, the Rider to Security Agreement   Trademarks and the Rider to Security Agreement   Cash Collateral Account.

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check <u>only</u> if applicable and check <u>only</u> one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check <u>only</u> if applicable and check <u>only</u> one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction
☐ Filed in connection with a Public-Finance Transaction

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/21/09)

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

Michigan Department of State - Uniform Commercial Code

**Filing Number: 20170703000626-6**

Filing Date and Time: 07/03/2017 02:08 PM

Total Number of Pages: 1

*(This document was filed electronically)*

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

**Corporation Service Company**
**2711 Centerville Road**
**Wilmington, DE 19808- USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**2012176622-6**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes:                                    AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **PNC Bank, National Association** | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
**Debtor: MID MICHIGAN FEED INGREDIENTS, L.L.C. - 317208 [133126984]**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)